SANTA FE INTERNATIONAL CORPORATION, et al., Plaintiffs,

v.

James G. WATT, Secretary of the Interior, et al., Defendants.

Civ. A. No. 83–347 MMS.

United States District Court, D. Delaware.

July 2, 1984.

As Amended July 17, 1984.

Andrew B. Kirkpatrick, Jr., and Martin P. Tully, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs; William T. Coleman, Jr., Richard C. Warmer, Carl R. Schenker, Jr., Christopher W. Savage, Susan S. Richardson, Donald L. Morgan, J. Eugene Marans and Jonathan J. Rusch, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., of counsel.

Joseph J. Farnan, Jr., U.S. Atty., and Richard J. McMahon, Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., F. Henry Habicht, II, Roger J. Marzulla and Lawrence W. Puckett, Dept. of Justice, Washington, D.C., for defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Former Secretary of the Interior James G. Watt issued a decision on March 10, 1983, barring Kuwaiti citizens and corporations from acquiring interests in oil and gas leases on public lands under the Mineral Lands Leasing Act of 1920, 30 U.S.C. §§ 181 *et seq.* (1982) (the "MLLA"). *See* "Decision on the Status of Kuwait Under the Mineral Lands Leasing Act of 1920 (30 U.S.C. § 181 et seq)," Docket Item ("Dkt.") 6A at 157 (cited hereinafter as the "March 10 Decision"). The present action challenges that decision.[1]

Section 1 of the MLLA, 30 U.S.C. § 181, provides that mineral rights on federally owned lands [2] may be leased only to United States citizens or corporations. It nonetheless allows aliens to own stock interests in U.S. corporations which hold mineral leases if certain conditions are met. Pursuant to the "alien qualification" proviso of section 1:

> Citizens of another country, the laws, customs, or regulations of which deny similar or like privileges to citizens or corporations of this country, shall not by stock ownership, stock holding, or stock control, own any interest in any lease acquired under the provisions of this chapter.

Secretary Watt's decision classified Kuwait as a "nonreciprocal" nation under this alien qualification provision, thereby preventing corporations with Kuwaiti stock ownership from holding federal mineral leases.

The plaintiff corporations in this case (referred to jointly as "Santa Fe"), all U.S. corporations, are ultimately owned by Kuwait Petroleum Corporation ("KPC"), a Kuwaiti corporation.[3] KPC in turn is owned by the sovereign nation of Kuwait. Santa Fe, according to its complaint, currently holds 275 oil and gas leases on 252,950 net acres of government land worth approximately $14 million dollars.[4] It has pending

---

**1.** The Court held in a previous opinion that venue in this district was proper under 28 U.S.C. § 1391(e)(4). *See Santa Fe Int'l Corp. v. Watt,* 580 F.Supp. 27 (D.Del.1984).

**2.** The MLLA governs leases only of *onshore* mineral rights. *Offshore* federally owned mineral rights are governed by the Outer Continental Shelf Lands Act ("OCLSA"), 43 U.S.C. §§ 1331 *et seq.* (1982), which contains no alien qualification provision.

**3.** Plaintiffs, C.F. Braun & Co. (a Delaware corporation) and Santa Fe-Andover Company (a

Wyoming corporation), are wholly owned subsidiaries of Santa Fe International Corporation (a Delaware corporation) whose voting stock is owned by KPC (U.S.) Holdings, Inc. (a Delaware corporation), whose stock in turn is owned by Kuwait Petroleum Corporation (KPC), a corporation organized and existing under the laws of Kuwait.

**4.** Dkt. 1 at 8. Other sources value these leaseholds at approximately $9 million. *See* Press Conference of James G. Watt, March 10, 1983, Dkt. 6A at 169, 175. When KPC purchased

95 applications for MLLA oil and gas leases covering 219,500 net acres.[5] Under the Secretary's March 10 Decision Santa Fe no longer qualifies to hold MLLA leases,[6] although the Decision left open the possibility that Santa Fe's existing leases could remain intact. *See* Press Conference of James G. Watt, March 10, 1983, Dkt. 6A at 169, 173–74, 177.

Santa Fe attacks the Secretary's Decision on two grounds. In count one Santa Fe contends that as a matter of law, based on undisputed facts, Secretary Watt's Decision was arbitrary, capricious, an abuse of discretion and contrary to law. In count two Santa Fe raises numerous procedural and due process challenges to the method by which the Secretary reached his Decision. Santa Fe has moved for summary judgment (or, in the alternative, for a preliminary injunction) on count one. The parties agree that count one raises no issues of material fact. The government has filed a cross motion for summary judgment on both counts one and two. The Court reaches a decision on count one only because the Secretary's Decision will be remanded for reconsideration of Kuwait's reciprocity status.

As explained below, Secretary Watt disqualified Kuwait because Kuwait discriminated "in effect" against United States citizens. Secretary Watt did not (and under Department of Interior precedent could not) disqualify Kuwait simply because Kuwait had nationalized its oil and gas industry. Rather, Secretary Watt relied on a coincidental difference in treatment between U.S. and Japanese citizens: he decided that Kuwait discriminated against U.S. interests when it nationalized its petroleum industry in the 1970's by acquiring all concessions held by U.S. corporations while leaving intact a Japanese concession in an offshore region administered jointly by Kuwait and Saudi Arabia. Secretary Watt did not, however, conduct an inquiry into whether Kuwait allowed the Japanese interest to remain in private hands for legitimate, objective reasons unrelated to Japanese or American citizenship. His analysis was therefore erroneous. The MLLA, the Court holds, allows disqualification of a foreign nation only if that country discriminates against U.S. citizens *because of* their citizenship. A mere difference in treatment will not suffice.

## I. Background

Certain background discussion will be helpful in understanding the Court's review of the March 10 Decision. In this section, the opinion will first survey the historical development of Kuwait's petroleum industry. Next, it will outline the Department of Interior's ("DOI") procedure for applying the alien qualification provision and will describe how those procedures were implemented in relation to Kuwait. It will then summarize the agency's decisions (both the March 10 Decision and an earlier decision on December 29, 1982) regarding Kuwait's status under the MLLA. With this background completed, the opinion will in the next section analyze Secretary Watt's interpretation of the alien qualification provision in light of congressional intent and agency precedent.

### A. Kuwait's Oil Industry

The history of Kuwait's petroleum industry is typical of that experienced by other less developed countries. Western oil companies participated heavily in the early development of Kuwait's hydrocarbon production but, in more recent years, their proprietary interests have given way to increased state ownership.

---

Santa Fe in 1981, it paid a price of approximately $2.5 billion, *id.,* making the federal mineral leases a small portion of Santa Fe's holdings.

**5.** Dkt. 1 at 8.

**6.** Santa Fe contends that, in addition to the loss of pending lease applications, it has lost many valuable business opportunities as a result of the March 10 Decision. Santa Fe asserts that it has been approached by several U.S. corporations interested in being acquired by Santa Fe and that Santa Fe has been unable to consummate these deals because those companies hold federal mineral leases. Dkt. 6 at 98–100.

Before Kuwait began a nationalization campaign in the 1970's, United States corporations, as well as other foreign corporations, actively developed Kuwait's petroleum resources. Over time, Kuwait granted a total of five different concessions to foreign interests:[7]

1) In 1934 Kuwait granted a concession for onshore mineral rights to Kuwait Oil Company ("KOC"), a corporation owned 50 percent by the American-owned Gulf Oil Corporation and 50 percent by British Petroleum.[8]

2) In 1948 and 1949 the American Independent Oil Company ("Aminoil"), a corporation wholly owned by American interests, was granted a concession for onshore petroleum rights.

3) In 1958 Kuwait granted an offshore concession to the Japanese-owned Arabian Oil Company ("Arabian Oil") in the "Divided Zone." The Divided Zone is a disputed territory claimed by both Kuwait and Saudi Arabia. Kuwait and Saudi Arabia share an undivided interest in oil production in the offshore portion of the Divided Zone and both have granted concessions to Arabian Oil. Arabian Oil is the sole continental shelf operator in the Divided Zone.

4) In 1961 Kuwait granted an offshore concession to Kuwait Shell Petroleum Development Company ("Shell"), a British-and-Dutch-owned subsidiary of Royal Dutch Shell.

5) In 1967 Kuwait granted an onshore concession jointly to Kuwait National Petroleum Company ("KNPC") (owned, in 1967, 60 percent by the Government of Kuwait and 40 percent by private Kuwaiti investors) and Hispanoil (a Spanish state-controlled oil company).

During the 1970's Kuwait nationalized most of its petroleum production industry. Beginning in 1974 the government acquired 60 percent of the British-and-U.S.-owned KOC, and, in 1976, Kuwait acquired the remaining 40 percent.

In 1975 the Government of Kuwait acquired the private Kuwaiti interests in KNPC, leaving Hispanoil as the sole non-governmental holder of that concession. The KNPC-Hispanoil concession eventually proved a failure. No commercial quantities of oil were ever produced, and in 1976 it suspended operations and relinquished its concession.[9]

The U.S.-owned Aminoil concession was nationalized in 1977 and, by agreement between the company and the Government of Kuwait, the issue of compensation proceeded to an international arbitration tribunal. In 1982 the tribunal awarded Aminoil almost $180 million.[10]

The Shell concession, like the KNPC-Hispanoil concession, never produced commercial quantities of oil. Shell drilled three unsuccessful test wells in 1962 and 1963, but discontinued drilling because of uncertainty regarding Kuwait's territorial rights in the area of Shell's exploration. With those rights still undetermined, Shell relinquished its concession in 1979.

In 1980 Kuwait established the Kuwait Petroleum Corporation, an entity wholly owned by the government of Kuwait, and assigned to KPC all government-owned shares of companies involved in the hydrocarbon industry.[11]

Only one concession remains (at least partially) in private foreign hands—the Arabian Oil concession in the offshore area

---

**7.** The following facts are drawn from the various briefs and appendices submitted by the parties and are for the most part uncontested.

**8.** The KOC concession originally covered all of Kuwait proper but was amended several times so that by 1963 it covered only onshore properties in the eastern area of Kuwait. Dkt. 6 at 39.

**9.** Secretary Watt's March 10 Decision places the time of relinquishment in 1978, not 1976, perhaps because it relied on erroneous material

supplied by the Kuwaiti Embassy. *See* Dkt. 6A at 16, 221 & n. *, 279–80.

**10.** *See* Final Award of the Arbitration Tribunal in the Matter of an Arbitration Between the Government of the State of Kuwait and the American Independent Oil Company (Aminoil), Dkt. 6A at 318.

**11.** *See* Decree Law No. 6 of 1980, cited in March 10 Decision at 4.

of the Divided Zone. In 1960 Kuwait and Saudi Arabia each acquired a 10 percent interest in Arabian oil. In 1974 Kuwait, and later Saudi Arabia, acquired an additional 50 percent interest in Arabian Oil. Thus, as it now stands, Japanese interests retain a 40 percent share of the Arabian Oil concession in both the Kuwaiti and Saudi Arabian undivided shares of the Divided Zone's continental shelf sector. Kuwait contends that for practical business reasons it would be unable to nationalize the remaining Japanese holding in the Divided Zone.[12]

According to the uncontested factual analysis contained in Secretary Watt's March 10 Decision, Kuwait's gradual elimination of foreign interests resulted not from any requirements of Kuwaiti law but from the discretionary decisions of Kuwaiti officials. No written law or policy prohibits foreign corporations from acquiring beneficial interests in Kuwaiti minerals. Although the 1962 Kuwaiti Constitution provides that all natural resources and derivative revenues are the property of the state (Kuwaiti Constitution, Art. 21), the Constitution permits the award of concessions "by a law and for a limited period" without restriction on nationality (Kuwaiti Constitution, Art. 152). In addition, foreigners may participate in commercial activities in Kuwait through joint stock companies and partnerships provided that 51 percent of the capital holdings is owned by Kuwaiti citizens. (Law No. 15 of 1960 (of commercial companies)). Joint ventures may be formed without limitations on citizenship. In some circumstances, foreign corporations may directly engage in commercial activities in Kuwait, although they may need to employ a foreign agent. *See* March 10 Decision at 4–5.

Despite the lack of formal legal barriers to foreigners, KPC today owns the sole onshore concession and, but for the offshore concession jointly owned by Arabian oil, it owns the only hydrocarbon conces-

sion granted by the Kuwaiti government. KPC is expressly authorized to participate with other companies and to establish companies in partnerships with others (Decree Law No. 6 of 1980, Art. 5), but has not entered into any joint operations with any foreign or domestic corporations. No new concession has been awarded since the creation of KPC in 1980.

### B. *Agency Procedures Under the MLLA*

Although recently the Department of Interior has attempted to clarify its procedures for applying the alien qualification provision, from 1920 until 1982 the agency implemented that provision without any written guidelines. Reciprocity decisions were generally made by the Bureau of Land Management ("BLM") in consultation with the State Department, and occasionally in consultation with the Interior Department's Office of the Solicitor. *See* "Secretarial Decision Paper: Procedures For Administering the Reciprocity Provision of the Mineral Land Leasing Act of 1920, 30 U.S.C. § 181 (MLLA)," May 7, 1982, Dkt. 6A at 307. The BLM maintained a list of reciprocal nations qualifying for federal leases and refused to grant leases to any corporations if aliens from nations not listed held more than ten percent of the corporation's stock. *Id.* The DOI, however, maintained no policy regulating the initiation of reciprocity reviews. *Id.* at 308. In addition, once reviews were begun, the Department used no fixed method for investigating the laws, rules and regulations of foreign nations. *Id.* at 314, 316.

New procedures were established on May 7, 1982. Notice of their promulgation was published in the Federal Register. 47 Fed.Reg. 27,622 (1982). Under the new rules, a list of reciprocal nations is no longer maintained. Instead, the BLM must maintain a "list of Nations that deny similar or like privileges." *Id.* at 27,623. Review of a particular nation's status is initiated upon submission of "information that

---

12. *See* Dkt. 6 at 15, 45–46, 83; Letter from the Ambassador of Kuwait to J. Robinson West, Assistant Secretary of the Interior for Policy, Budget, and Administration, May 4, 1983, Dkt. 6A at 253, 267–272.

the Department of the Interior does not have concerning the pertinent laws, customs or regulations of the nation in question." *Id.* The Department can then conduct its review internally or "externally through a request for public comments published in the Federal Register" if the Department does not have sufficient information to make an informed judgment. *Id.* Finally, the BLM on its own may review a particular nation's status when it determines "that such a review is appropriate" —soliciting assistance from the Department of State, Department of Commerce, the Interior Department's Solicitor's Office as well as other concerned agencies. *Id.* Decisions regarding reciprocity must be made by the Assistant Secretary-Land and Water Resources and with the Solicitor's concurrence. *Id.*

### C. *DOI Review of Kuwait's Status*

The Department of Interior published a notice in the Federal Register on July 8, 1982, requesting public comments on the status of Sweden, Cyprus and Kuwait under section 1 of the MLLA. 47 Fed.Reg. 29,720.[13] The initial comment period expired on August 9, 1982, but was extended by 60 days for additional comments on Kuwait's status only. 47 Fed.Reg. 35, 559 (1982). The Assistant Secretary—Land and Water Resources, with the concurrence of the Solicitor, issued its Decision on Kuwait's status on December 29, 1982 ("December 29 Decision"), Dkt. 6A at 50. This December 29 Decision was later reversed by Secretary Watt in his March 10 Decision.

### 1. *The December 29 Decision*

The December 29 Decision purported to apply a February 2, 1982, memorandum to the Secretary from the Associate Solicitor, Energy and Resources (Dkt. 6A at 290) which enumerated three standards for determining reciprocity status. The first standard requires an inquiry into whether the foreign country allows United States citizens to participate through stock ownership in corporations which, "in turn, are not precluded or unreasonably restricted from participating in the foreign country's mineral resources on its public lands because of the United States citizen's stock ownership." December 29 Decision at 3. Under the second standard, if the country denies stock ownership, the Department must determine whether the foreign country allows other opportunities for investment or participation in the country's mineral resources. Finally, if the country does restrict investment or participation to state-owned entities, "the Department must, under the third standard, determine whether discrimination exists against citizens or corporations of the United States." *Id.*

The December 29 Decision concluded that Kuwait has by *law* allowed foreign investment in the country's oil resources. *Id.* at 5. The Decision cited that under the Kuwaiti Constitution and written Kuwaiti policies and laws U.S. citizens are permitted to hold interests in Kuwait's petroleum resources. The December 29 Decision did, however, recognize that "[t]he prevailing *custom* in Kuwait has been to consolidate all oil and gas activity under the ownership of the Government and, since 1980, in the [KPC]. . . ." *Id.* at 4. (emphasis added) KPC had entered into no joint ventures with foreign countries and Kuwait had offered no concessions to foreign companies. *Id.* Other than the Japanese interest in the offshore Divided Zone concession, the Decision explained, no oil and gas interests exist except those of the state-owned KPC. *Id.* at 5.

Nonetheless, the Assistant Secretary concluded that Kuwaiti laws, customs and regulations do not "discriminate[ ] against investment by United States citizens." *Id.* at 4; *see also id.* at 6. The alien qualification provision, his Decision explained, was intended to avoid foreign retaliation against investments by United States citi-

---

**13.** In 1980 Kuwait had, through the State Department, requested a determination of its reciprocity status, but according to Santa Fe no official action was taken until the DOI published its request for comments in July, 1982. *See* Dkt. 6 at 28.

zens. The Act has always been administered, according to the Decision, to focus on whether investment by United States citizens in a foreign corporation affected "the ability of that corporation to participate in the mineral resources of the foreign country." *Id.* In the case of Kuwait, the Decision concluded, the fact of American citizenship did not result in discrimination. Companies had not been denied participation in Kuwait's mineral resources "because citizens of the United States held an interest." *Id.* at 7. Thus, Kuwait did not "deny similar or like privileges" within the meaning of section 1 of the MLLA. *Id.*

The Assistant Secretary explained that by law Kuwaiti citizens, just like American citizens, may not invest in KPC. Furthermore, he found "no evidence that KPC has engaged in any joint participation activities with companies owned by Kuwaiti citizens to the exclusion of companies owned in whole or in part by citizens of the United States." *Id.* at 5. Kuwait's laws, customs and regulations, the Decision stated, "are applicable to all private investment in mineral resources, whether that investment is by citizens of Kuwait, by citizens of the United States, or citizens of any other country." *Id.*

The Assistant Secretary cited as precedent the 1974 decision on Great Britain's nationalization of coal. There "the Deputy Solicitor emphasized that the citizenship of

an individual or corporation was irrelevant to investment in the coal resources of Great Britain." *Id.* at 6. Because no private persons or corporations, British or foreign, could invest in British coal resources, the Assistant Secretary explained, Britain's nationalization did not disqualify it under section 1. *Id.*

### 2. *The March 10 Decision*

Despite the apparent finality of the December 29 Decision,[14] on January 21, 1983, the Assistant Secretary, with concurrence of the Solicitor, suspended the December 29 Decision—a decision they now termed a "preliminary decision."[15] *See* "Suspension of Decision on the Status of Kuwait Under the Mineral Leasing Act of 1920 (30 U.S.C. §§ 181 et seq.)," Dkt. 6A at 92.

On March 10, 1983, Secretary Watt issued his challenged decision. Relying on the same factual information as did the Assistant Secretary's December 29 Decision,[16] and purporting to apply the same three-part reciprocity test, the Secretary concluded, under the third standard, that the "actual custom" of Kuwait was to discriminate "against U.S. citizens and corporations." March 10 Decision at 8. Kuwait discriminated in its course of nationalization and "discrimination continues," the Secretary stated, "since the Arabian Oil Company concession continues to exist."[17]

---

**14.** The published agency procedures required only a decision of the Assistant Secretary—Land and Water Resources with concurrence by the Solicitor, *see* text *supra* at 934, as was done in the case of the December 29 Decision.

**15.** Plaintiffs would imply that the suspension resulted from political pressures, and point to a luncheon held three days earlier between Secretary Watt and representatives of the American Jewish Committee—a matter that forms a part of plaintiffs' second claim. Plaintiffs' second count contains other extensive allegations of improper conduct by the Department of Interior and Secretary Watt arising out of the suspension of the December 29 Decision and the rendering of the March 10 Decision. They complain of off-the-record discriminatory ex parte contacts, improper influence, failure to adequately explain the reasons for suspending the December 29 Decision and failure to follow agency procedures and precedent.

**16.** *See* Transcript of March 26, 1984, hearing, Dkt. 22 at 63–64; Letter from Secretary Watt to Representative John D. Dingell, April 12, 1983, Dkt. 6A at 184.

**17.** The Secretary noted in his Decision that the Shell and Hispanoil concessions outlived some American concessions and were permitted to be voluntarily relinquished, perhaps implying that this earlier "discrimination" justified a current finding of nonreciprocity. March 10 Decision at 6, 8. Santa Fe argued in its briefs that the histories of the Shell and Hispanoil concessions were irrelevant for present purposes because the concessions no longer exist and, further, because they never produced commercial quantities of oil. The government, however, conceded at oral argument that the Secretary's decision could properly hinge only on the continuing Japanese concession. *See* Dkt. 22 at 58. "[I]f we did not have the Japanese concession here," counsel for defendants stated, "the outcome in

*Id.* While the record lacked evidence of an "overt plan to nationalize only U.S. interests," the Secretary said, "actual discrimination in favor of the citizens of other nations" was "readily apparent." *Id.* According to the Secretary, the alien qualification provision "does not require a showing that such 'similar or like privileges' be purposefully abridged." *Id.* "[E]ffective discrimination only," the Secretary asserted, "is sufficient to lead to the conclusion that a country is non-reciprocal." *Id.*

## II. *Discussion*

In count one plaintiff raises a two-pronged attack against Secretary Watt's decision. First, Santa Fe argues that the Secretary incorrectly relied on a "mere difference in treatment" between Japanese and U.S. interests without inquiring into whether Kuwait "differentiated between concessions *on the basis of the nationality of the concessionaires.*" Dkt. 6 at 60. This difference in treatment, Santa Fe states, cannot disqualify Kuwait because "Kuwait's actions were based on legitimate, objective differences in the circumstances of the various concessionaires." *Id.* at 61. Second, it argues that only onshore, not offshore, policies of foreign nations are relevant to the reciprocity inquiry under section 1 because the MLLA governs only onshore federal leases in the United States. *Id.* at 26–27, 87–90.

The Court agrees with Santa Fe's first ground of attack. The second ground will remain open for further consideration by the Secretary on remand.

### A. *Meaning of "Similar or Like Privileges"*

This Court can overturn the March 10 Decision only if Santa Fe establishes that the Decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). This is a narrow standard of review which does not empower a court "to substitute its judgment for that of the

agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Rather, a court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*

■■■ In this case, the agency's inquiry into relevant factors depended upon its interpretation of the MLLA. When an agency is charged with administering a statute, its interpretation of that statute ordinarily is entitled to great deference. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Its construction "should be followed unless there are compelling indicators that it is wrong." *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Delpro Co. v. Brotherhood Railway Carmen,* 519 F.Supp. 842, 846 (D.Del.1981), *aff'd* 676 F.2d 960 (3d Cir.), *cert. denied,* 459 U.S. 989, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982).

Where an agency renders an interpretation that is contrary to legislative history or purpose, however, its decision is not entitled to independent weight. *Chevron, Inc. v. N.R.D.C.,* — U.S. ——, ——, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 94, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973); *Hi-Craft Clothing Co. v. N.L.R.B.,* 660 F.2d 910, 914 (3d Cir.1981). Deference to an agency's interpretation must be "constrained by [the court's] obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history." *Hi-Craft Clothing Co. v. N.L.R.B.,* 660 F.2d at 915, *quoting Southeastern Community College v. Davis,* 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). Moreover, although an agency's longstanding construction of a statute under its authority is entitled to respect, *see Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct.

the case would be different." *Id.* The Court agrees with government counsel that to the extent Secretary Watt relied on the now extinct

Shell and Hispanoil concessions his decision is not sustainable.

849, 854–55, 28 L.Ed.2d 158 (1971), if an agency departs from its own precedent it must supply a reasoned analysis for its change of course. *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, ___–___, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

In this case the Court is unable to uphold the challenged agency action because, as explained below, Secretary Watt deviated without adequate explanation from longstanding agency precedent. More importantly, Secretary Watt departed from the clear legislative purpose underlying the MLLA's alien qualification provision. *See Morton v. Ruiz*, 415 U.S. at 237, 94 S.Ct. at 1075; *Natural Resources Defense Council v. E.P.A.*, 683 F.2d 752, 760 (3d Cir.1982); *Columbia Broadcasting System, Inc. v. F.C.C.*, 454 F.2d 1018, 1027–28 (D.C.Cir.1971); *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 850 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Contrary to Secretary Watt's March 10 Decision, the legislative history behind the alien qualification provision illustrates Congressional concern about more than a mere random difference in treatment. Congress incorporated the alien qualification provision into the MLLA to prevent discrimination and avoid retaliation against United States citizens, not to erect artificial barriers against alien participation in U.S. mineral leases.

**1.** *Legislative History*

When first introduced in Senate Bill 2775, the MLLA contained an absolute prohibition against alien leasing of federally owned mineral rights. The alien qualification provision was substituted by the House and never received Senate debate. The Senate floor did pass an earlier amendment, however, that is some aid in discerning congressional intent. A Senate "Presidential takeover" amendment proposed to allow foreign investment in U.S. corporations holding leases so long as each lease contained a clause authorizing the Presi-

dent to take over and operate the lease. *See* Cong.Rec. 4160, 4171 (August 22, 1919). Debate on the Senate's Presidential takeover amendment reflects concerns similar to those underlying the alien qualification provision.

The Senate discussions demonstrate, in particular, two concerns. The first is a fear that an absolute ban on foreign investment, as contained in the original bill, would provoke retaliatory measures from foreign countries. *See* 58 Cong.Rec. 4160–4164, 4170, 4282–83 (remarks of Senators Smoot, Fall, King, Phelan and Thomas). The second is a desire to protect American natural resources from foreign domination and to preserve those resources for the future economic and military security of the United States. *See* 58 Cong.Rec. 4160–62 (remarks of Senators Fall, Smoot & Phelan).

The House of Representatives inserted into S. 2775 the alien qualification provision as it now reads. The House Committee on Public Lands Report on S. 2775, H.R.Rep. No. 398, 66th Cong., 1st Sess. (1919), explained that the House amendment, like the Senate amendment, sought to avoid retaliation while at the same time protecting the United States against foreign domination of domestic mineral resources. According to that report:

The House amendment to [section 1] seeks to avoid retaliatory action against American investors in foreign countries and provides that no citizen of any foreign country shall, by stock ownership, stock holdings, or stock control, own any interest in any lease acquired under the provisions of this act where such foreign country, by its laws, customs, or regulations, denies similar or like privileges to citizens or corporations of this country. The main argument for the Senate draft was that foreign control of domestic corporations operating a lease under the act would result in large exportations of oil, coal, and other minerals covered by the act, and thereby deplete the domestic supply. Under the House reciprocal clause above mentioned it is obvious that

the citizens of the United States could largely offset such a result by their own operations in foreign countries, or, if an acute situation ever developed, a general embargo against exportation would be a sufficient remedy.

H.R.Rep. No. 398, 66th Cong., 1st Sess. at 11.

House floor debate on the amendment was sparse. Nonetheless, discussions between Representative Sinnott, Chairman of the Committee on Public Lands, and other House members again identify a purpose of avoiding retaliation · by foreign nations in reaction to a U.S. restriction against alien ownership. In addition, those discussions identify a further purpose of encouraging

foreign countries who already discriminate against United States citizens to eliminate their discriminatory practices. *See* 58 Cong.Rec. 7513–15, 7528–29.[18]

### 2. *Agency Precedent*

Prior to Secretary Watt's March 10 Decision, the DOI had interpreted section 1 in a manner consistent with its clear legislative purpose. The best indication of administrative precedent is the DOI's own February 2, 1982, memorandum, which Secretary Watt purported to rely on, outlining the three-part methodology for applying the alien qualification provision. This memorandum reflects the most exhaustive interpretation to date by the DOI of section 1.

---

**18.** It might seem that congressional concern about discrimination would have led over the years to findings of nonreciprocity for countries who have nationalized their mineral industries. To the contrary, the Department of Interior, as mentioned earlier, has since 1974 interpreted the alien qualification provision as not *per se* disqualifying nations which have nationalized their mineral resources. Secretary Watt abided by this precedent in his Decision on the status of Kuwait and neither Santa Fe nor the government here seeks to challenge that precedent in this case. Both, in fact, argue that legislative history supports the Department's view that nationalization itself does not *per se* disqualify a country from reciprocal status under the MLLA. Congress was concerned, they argue, not about the self-interested actions of oil producing countries but about hegemonic schemes of oil importers, such as Great Britain, to entice oil exporting nations to discriminate against U.S. interests in favor of their own interests.

The legislative history on this issue is not as clear to the Court as it is to the parties. While some Senate debate does support this anti-hegemony theory, *see e.g.,* remarks of Senators King and Smoot, 58 Cong.Rec. at 4282 (expressing fear of embargo against U.S. by Mexico induced by Great Britain), other debate displays concern with direct retaliatory responses by oil producing countries. *See. e.g.* remarks of Sen. King, 59 Cong.Rec. at 4161 (expressing fear that central American countries would confiscate U.S.-owned oil fields); remarks of Sen. Thomas, 58 Cong.Rec. at 4163 (expressing fear of the "proposed exclusion of alien ownership in Mexico of any oil interest whatever."); remarks of Sen. Phelan, 58 Cong.Rec. at 4164 (citing that Mexico "has been studying the question of a State monopoly of production and distribution."); remarks of Sen. King, 58 Cong.Rec. at 4282 (expressing fear of retaliation from oil producing nations). In light of the portions of

the legislative history supporting an anti-hegemony theory, DOI's precedent involving British coal, and the unanimous litigating posture of all parties to this action, the Court will not further address that portion of the Secretary's March 10 Decision embracing the DOI's nationalization policy.

Secretary Watt, although accepting the nationalization rule in his December 10 Decision, earlier characterized the British coal decision in congressional testimony as "the contorted reasoning of a lawyer." *Hearings Before the Committee on Energy and Natural Resources, United States Senate,* 98th Cong., 1st Sess. 385 (1983). Perhaps this was because the anti-hegemony theory now advanced by the parties was not a basis for the DOI's British coal decision. In an August 23, 1974, letter from the Deputy Solicitor to the Legal Advisor for Economic and Business Affairs, Department of State, the Deputy Solicitor announced the Department's conclusion that Britain was a reciprocal nation even though Britain had nationalized its coal industry. Dkt. 6A at 302. The Deputy Solicitor explained that the words " 'similar or like privileges' must be determined by reference to the other words in the section with which they are associated"— that is—the words "rights of stock ownership." Since the United Kingdom prohibited all private · ownership of coal and did not prohibit United States citizens "the right to own, hold, or control stock in corporations organized under their laws," the United Kingdom could not be said to deny like privileges within the meaning of the MLLA. *Id.* at 303. "Any impossibility of American citizens holding stock in British corporations owning coal interests arises not because the laws of the United Kingdom deny American citizens the right to own, hold, or control stock in British corporations, but because of the general British policy of nationalization of coal resources which prevents British corporations from owning coal interests." *Id.* at 304.

Relying on legislative intent and prior administrative interpretations, the memorandum explains that discrimination on the basis of nationality, not mere differences in treatment, is required for a finding of nonreciprocity. First, recognizing the dual congressional goals of protecting natural resources and avoiding retaliation, the memorandum explains that "the reciprocity provision should ... be applied to prohibit the uncontrolled and unchecked exportation of domestic mineral resources and to *discourage foreign retaliation* against investment by United States interests." Dkt. 6A at 293. (emphasis added). Reviewing early agency applications of section 1, the memorandum cites a 1939 decision by the Commissioner of the General Land Office (the predecessor to the BLM) which explicitly stated that the alien qualification provision required an "affirmative denial" of like or similar privileges. *Id.* at 294.[19] The memorandum explains that a foreign country may be nonreciprocal even if it allows meaningful stock participation in its corporations "if it *discriminates against* United States interests." *Id.* at 8 (emphasis added). Such discrimination exists, the memorandum explained, if a corporation *"because of the stock ownership by United States citizens*, may not invest in the foreign country's minerals on public lands." *Id.* (emphasis added).[20]

### 3. *Secretary's Interpretation of Section 1*

Legislative history and prior agency precedent are thus clear that section 1 is concerned about discrimination against U.S. citizens by foreign countries. The government, as it must, agrees that one purpose behind section 1 was "to dissuade foreign countries from discriminating against U.S. corporations and citizens in exploitation of those countries' domestic oil and gas or mineral resources." (Dkt. 14 at 15). The government argues, in fact, that Secretary Watt's decision sought to determine, and did determine, "whether Kuwait

---

**19.** The memorandum also cites early precedent to support the proposition that investment opportunities in foreign countries need not be identical to those offered in the U.S. so long as those opportunities were not "unduly restrictive or harsh." *Id.* at 293–94. In 1928, explains the memorandum, the DOI permitted investment by citizens of the Netherlands because, while U.S. citizens could not participate in oil development in Holland, they were permitted and did participate in oil development in the Dutch East Indies. *Id.* at 293. Similarly, in 1936, Great Britain was classified as reciprocal even though companies were required to incorporate an operating company in Great Britain with at least one British director and a majority of British employees. *Id.*

For this reason, neither the March 10 nor the December 29 Decision found Kuwait's requirement of a minimum 51% Kuwait ownership "unduly harsh or restrictive." March 10 Decision at 7; December 29 Decision at 5. Similar restrictions in Canadian law were found not to deny similar or like privileges in a February 2, 1982, Decision on the reciprocity of Canada. *See* "Secretarial Decision Paper: Reciprocity Status of Canada," Dkt. 15, App. A.

**20.** The government contends that its 1982 decisions regarding the status of Canada and regarding the status of Sweden and Cyprus did not focus on whether those nations intentionally or purposely discriminated against Americans but,

instead, applied only a "factual" test. In those cases, however, because the DOI did not attempt to rely upon effective differences in treatment, it was unnecessary to inquire further into the reason behind those governments' actions. *See* Dkt. 15, App. A & B.

The March 10 Decision cited as precedential support for its decision a 1920's decision which found the Netherlands nonreciprocal. Secretary Watt explained that U.S. citizens and corporations "did not own concessions in Dutch petroleum resources" but that there was "no compelling evidence which demonstrated that the Netherlands intended to discriminate." March 10 Decision at 8. Only later, he stated, when U.S. citizens were permitted to participate in Dutch oil development was the country, in 1936, considered qualified under section 1. *Id. See also* February 2, 1980, Memorandum from Associate Solicitor to Secretary re: Determinations of Reciprocity under Section 1 of the Mineral Lands Leasing Act of 1920 at 4, Dkt. 6A at 293. The Netherlands, however, did not have a system of state ownership as does Kuwait. Instead, that country affirmatively exercised a policy "to effect development through offering to the highest bidder, presumably *only Netherlands citizens being eligible as bidders.*" Letter from Secretary of Interior to Secretary of State, October 19, 1920, Dkt. 16A, tab 20, attachment A. (emphasis added). Thus, the difference in treatment afforded Americans was based on citizenship.

has favored the nationals of other countries over Americans." *Id.* This favoritism, however, argues the government, is shown by proof that "Americans were not treated equally .. regardless of the intent of such unequal treatment." *Id.* at 16. Secretary Watt, the government concedes, made no "attempt to determine *why* Kuwait undertook the particular method of achieving nationalization." *Id.* at 17. *See also* Dkt. 22 at 60–61.

The government's application of section 1 cannot be accepted. A country cannot be said to deny "similar or like privileges" where, for reasons unrelated to nationality, United States citizens happen to be left with less mineral rights than citizens of another nation.[21] Such a standard would not serve the legislative goals of discouraging retaliation and ending anti-U.S. discrimination. It would, instead, result in arbitrary disqualification of foreign nations. This was implicitly recognized by the DOI in its December 29 Decision. Secretary Watt's abrupt reversal of that Decision cannot be supported by any reasonable interpretation of section 1. An agency is, of course, free to reverse its policies and need not blindly adhere to agency precedent. *See Atchison, T. & S.F. Ry. Co. v. Wichita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *E.I. DuPont de Nemours & Co. v. N.L.R.B.,* 733 F.2d 296 (3d Cir.1984). But where, as here, a new interpretation, inconsistent with legislative history, is adopted without explanation, that new interpretation should not be embraced by the court. *See Motor Vehicle Manufacturers Association,* 103 S.Ct. at 2866–67; *Morton v. Ruiz,* 415 U.S. at 237, 94 S.Ct. at 1075.

The government argues that even if Kuwait's reasons are relevant to its reciprocity status, Santa Fe is trying to place on the DOI the burden of proving those reasons. Such a burden, the government contends, is not required by the MLLA. The Court agrees that the MLLA imposes no such burden.[22] But the DOI, in a case such as this, where no evidence whatsoever suggests that decision-making on the basis of

---

**21.** Counsel for the government, in an extremely able oral argument, conceded that at least some differences in treatment which are based on legitimate, nondiscriminatory factors would permit a finding of reciprocity. The Court posed a hypothetical offered earlier by counsel for plaintiff. If a U.S. corporation lost its bid for a concession after free competitive bidding, the Court asked, would there be discrimination for purposes of reciprocity under section 1? Counsel for the government answered no: "So long as that bidding system is operated on the basis of this objective standard, presumably dollars and cents, the rules are the same as applied to everyone, then indeed that, it seems to me, would not make the nation discriminatory or non-reciprocal." (Dkt. 22 at 51).

That response was correct. So long as all persons are afforded opportunities to invest on an equal basis, there is no discrimination. Where for objective reasons, one side holds mineral rights and another does not, that is not a denial of like privileges. As stated elsewhere by counsel for the government, the issue is "whether Americans are getting the same rights that are provided to the citizens" of other countries. *Id.* at 57. So far as the record in this case reveals, Americans were afforded the same rights as other nationals, and application of those same rights led to the nationalization of all interests other than the Japanese Divided Zone interest.

**22.** Santa Fe invited the court to base its decision on analogy to federal employment discrimination statutes and to the Equal Protection and Privileges and Immunities clauses of the United States Constitution. In cases arising under those statutes and clauses, Santa Fe argued, courts find discrimination only if decision-making was based on impermissible factors. Difference, in treatment, Santa Fe states, while sometimes alone sufficient for a disparate impact theory under Title VII of the Civil Rights Act of 1964, *see International Bro. Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), gives rise to liability only when valid statistical figures from a large enough sample create an inference of decision-making on the basis of race or sex. The Court declines Santa Fe's invitation and, rather, renders a decision based solely on the clear legislative purpose behind section 1. The MLLA was drafted long before the employment discrimination statutes of more recent vintage were enacted and is not based on constitutional principles of equal protection or privileges and immunities. The case law cited by Santa Fe does, however, support this Court's conclusion that where Congress seeks to eliminate discrimination, that goal will effectively be furthered only if liability arises from conduct based on impermissible factors.

citizenship occurred, must at least inquire into the cause of the difference in treatment. There may be some cases in which indirect evidence might be sufficient to draw an inference of discrimination on the basis of U.S. citizenship. The record in this case, however, does not support such an inference and shows only objective reasons behind the continuation of the Arabian Oil concession.[23] No evidence suggests that the Japanese were treated favorably be-. cause they were Japanese or that Americans were treated differently because they were Americans.[24] Instead, all of the evidence suggests that citizenship was entirely irrelevant to Kuwait's decision to leave the Arabian Oil concession in private hands. Where U.S. citizens or corporations stand differently from those of other nations because of an even-handed application of legitimate business practices, there can be no finding of nonreciprocity.

Counsel for the government stated at oral argument that prior to March 10 the DOI conducted no inquiry into the reasons for the survival of the Japanese concession.[25] Although Santa Fe seeks a final determination of reciprocity, the DOI should first be afforded the opportunity to conduct an investigation enabling it to render a decision in accordance with the appropriate standard. *See N.L.R.B. v. Enterprise Association of Pipefitters*, 429 U.S. 507, 522 n. 9, 97 S.Ct. 891, 900 n. 9, 51 L.Ed.2d 1 (1977); *Amoco Production Co.*

*v. N.L.R.B.*, 613 F.2d 107, 111–12 (5th Cir. 1980).

### B. Consideration of Offshore Concessions

Santa Fe bases its second ground for reversal on what it contends was Secretary Watt's improper reliance on Kuwait's offshore policies. Santa Fe argues that because the MLLA applies only to onshore mineral rights, and because the U.S. does not restrict alien leasing of offshore mineral rights, a foreign country's offshore policies and practices are irrelevant to reciprocity determinations under the MLLA. They present the DOI's decision on the status of Sweden as precedent for this position, where the DOI cited as "not directly relevant" the Swedish offshore oil statute. "Decision on the Status of Sweden and Cyprus under the Mineral Lands Leasing Act of 1920" at 3, Dkt. 15, App. B.

The government responds that the Swedish decision supports Secretary Watt's action because in that decision the DOI relied on offshore practices as "evidence" of Swedish laws and customs. *See id.* It further argues that because Kuwaiti laws and customs make no distinction between offshore and onshore practices, Kuwait's treatment of offshore concessions is directly relevant to the country's onshore practices. Finally, the variety and complexity of federal laws regulating oil and gas re-

---

23. According to the international tribunal which arbitrated Aminoil's claim for compensation, Kuwait's decision to spare Arabian Oil from nationalization was not "tainted with discrimination." Dkt. 6A at 361. The tribunal explained that "it has never for a single moment been suggested that it was because of the American nationality of the Company" that Aminoil's concession was nationalized. *Id.* The tribunal found "convincing" the Kuwaiti Minister for Oil's explanation that Arabian Oil's "non-nationalization" resulted because of Arabia's special expertise in "high-cost off-shore production" and because of the shared arrangement with Saudi Arabia in the Divided Zone. *Id.* at 361–62.

24. Indeed, the history of American participation in Kuwait's oil production industry shows, if anything, a treatment more favorable than that granted other nations. As explained in plain-

tiff's opening brief, prior to nationalization "companies with partial or complete U.S. ownership held the two earliest and longest-running concessions and provided over 16 billion barrels of oil, representing ... over 90 percent of the total production in Kuwait." Dkt. 6 at 36–37 (emphasis deleted).

25. *After* Secretary Watt's March 10, 1984, decision was rendered, the DOI did, in response to concerns expressed by the government of Kuwait, request specific information regarding the Divided Zone and the Arabian Oil concession. *See* Letter from J. Robinson West, Assistant Secretary of the Interior for Policy, Budget, and Administration to the Ambassador of the State of Kuwait, April 19, 1983, Dkt. 6A at 180. The Ambassador of the State of Kuwait responded in a 21-page letter on May 4, 1983. *See* Dkt. 6A at 253.

sources, it argues, makes dependence on exact parallelism with foreign laws impracticable. The MLLA, explains the government, extends to the "high tide mark" while the OCSLA applies to "submerged lands lying seaward and outside of the areas beneath 'navigable waters.' " Dkt. 14 at 23. Other statutes, it explains, govern naval petroleum reserves,[26] oil and gas leasing in the National Petroleum Reserve in Alaska,[27] and drainage of oil and gas from beneath federal lands otherwise unavailable for leasing.[28] *Id.* "No foreign government," the defendants state, "is likely to have the same mix and diversity of laws governing its oil and gas resources." *Id.*

The Court finds the government's position a reasonable one that is not contradicted by the language of the statute, legislative history or decisive agency precedent. The Court therefore would be compelled to defer to such an interpretation of the statute had it been adopted by Secretary Watt.

The record is not clear, however, that Secretary Watt actually addressed this specific statutory question in his March 10 Decision. Despite government counsel's concession at oral argument that the Japanese holdings constituted the sole legitimate basis for finding nonreciprocity, *see* note 18 *supra*, a reading of the March 10 Decision reveals that Secretary Watt did, to some extent, rely on the now extinct Shell and Hispanoil onshore concessions as well. Thus, the Secretary may not have focused his attention on the question of whether offshore practices could independently provide a basis for a nonreciprocity finding.

As a consequence, the Court cannot say that the DOI has interpreted section 1 as the government now says it should be interpreted. Thus, although the Court cannot grant Santa Fe's requested relief on the basis of its second argument, it also cannot discern with certainty how the DOI actually interpreted section 1. On remand, the Secretary may accept the interpretation of section 1 advanced here by government counsel or, if he desires, may adopt some other reasonable interpretation not inconsistent with the statute.

*Conclusion*

In summary, section 1 of the MLLA does not permit a finding of nonreciprocity based solely on differences in treatment resulting from objective business practices. Secretary Watt's decision to the contrary was arbitrary and capricious and not in accordance with law. This case will therefore be remanded for a determination of whether Kuwait treated U.S. citizens or corporations differently than citizens or corporations of other nations because of their nationality. If the Japanese interests in the Arabian Oil concession were allowed to survive for legitimate and objective business reasons, and not for reasons relating to nationality, then the DOI must find Kuwait qualified under section 1 of the MLLA. The DOI is free to consider on remand whether the offshore practices of Kuwait may constitute a basis for disqualification under the MLLA.

---

**26.** 10 U.S.C. §§ 7420–7438 (1982).

**27.** 42 U.S.C. § 6508 (1982).

**28.** 40 Op.Att'y Gen. 41 (1941).