**SHELL OIL COMPANY, Plaintiff,**

v.

**Bruce BABBITT and The U.S. Department of the Interior, Defendants.**

**Civil Action No. 95–492 MMS.**

United States District Court, D. Delaware.

Nov. 14, 1996.

794

Frederick L. Cottrell, III, of Richards, Layton & Finger, Wilmington, DE (L. Joe Leggette, and Jackson & Kelly, Washington, DC, of counsel), for plaintiff.

Gregory M. Sleet, United States Attorney, and Patricia Hannigan, Assistant United States Attorney, Department of Justice, Wilmington, DE; Richard M. Hall, United States Department of Natural Resources Division, Washington, DC (Sarah L. Inderbitzin, Esq., United States Department of the Interior, Washington, DC, of counsel), for defendant.

Gregg E. Wilson, Deputy Attorney General, Department of Justice, Wilmington, DE (Lee Ellen Helfrich, and Dina R. Lassow, of Lobel, Novins & Lamont, Washington, DC, of counsel), for Controller of the State of California (amicus); Richard P. Ieyoub, Attorney General, and Emory A. Belton, Jr., Assistant Attorney General, State of Louisiana (amicus).

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff Shell Oil Company ("Shell" or "Shell Oil") has filed suit against defendants Bruce Babbitt, as Secretary of the Department of the Interior ("DOI"), and the Department of the Interior (collectively "the Government" or "defendants"), seeking review of a decision issued by the Department of the Interior's Minerals Management Service ("MMS") dated April 3, 1990. Docket Item ("D.I.") 1 at ¶ 1. The MMS order requires Shell to disclose documents pertaining to Shell's purchase and resale of certain crude oil. D.I. 8 at Exhibit ("Exh.") 1. The oil in question was produced on federal land leased by Shell Western Exploration & Production Inc., ("Shell Ex"), a wholly owned subsidiary of Shell Oil. D.I. 8 at Exh. 2. Shell asserts the defendants are not entitled to the documents at issue, that the MMS order should be vacated, and that it is entitled to relief on the merits of its dispute with the Government. D.I. 1 at ¶ 9.

Both parties filed motions for summary judgment. Judicial review of this matter is undertaken pursuant to the Administrative Procedure Act, 5 U.S.C. § 702. Jurisdiction is founded upon 28 U.S.C. § 1331. For the reasons stated below, the Government's motion for summary judgment will be granted, and Shell Oil's motion for summary judgment will be denied.

## II. LEGAL AND FACTUAL BACKGROUND

This Court's March 13, 1996 opinion denying the Government's motion to transfer provides a clear and brief statement of the factual background. D.I. 21. Nevertheless, the Court will again summarize the facts, virtually undisputed, and provide the legal background for the pending summary judgment motions. During the period January 1, 1985, through December 31, 1988, Shell Ex, which is not a party to this action, produced crude oil from land leased from the United States. D.I. 8 at Exh. 2. As lessee, Shell Ex was the designated payor of royalties on the oil to the United States under the Mineral Lands Act, 30 U.S.C. § 226(c).

The royalties paid to the federal government by Shell Ex were based on a specific percentage of the "value of the production" of the crude oil removed from the land and sold under the leases. D.I. 1 at ¶ 8(b). The rate of "value of production" is established in regulations promulgated by the Secretary of the Interior for royalty valuations on oil produced under federal leases. *See* 30 U.S.C. § 189.

After producing the crude oil, Shell Ex sold it to Shell Oil pursuant to a purchase and sales agreement dated January 1, 1985. D.I. 8 at Exh. 2. The purchase and sales agreement between Shell Ex and its parent, Shell Oil, established a price for the crude oil based upon the average prices posted by its competitors ("third party" or "posted" prices) for the purchase of like-kind oil from producers. D.I. 1 at ¶ 8b; D.I. 7 at 6–7. Shell Oil subsequently sold the oil it had purchased from Shell Ex to third parties. D.I. 8 at Exh. 2.

By authority delegated under 30 U.S.C. § 1735, the Controller's Office of the State of California audited Shell Ex's royalty payments under the federal leases for the period January 1, 1985 through December 31, 1988. D.I. 8 at 2. The Controller's office reported its findings to MMS. That report concluded that the initial sale of oil from the producer, Shell Ex, to the marketer, Shell Oil, was a non-arm's length transfer between two corporate affiliates. D.I. 7 at Exh. 4. Shell Oil does not dispute that conclusion for purposes of the cross motions for summary judgment presented here.

On April 3, 1990, MMS issued an order stating that because the inter-affiliate sale

was not viewed as an arm's-length transactions, the "value of production" should be based on the subsequent sale of that oil by Shell Oil to third parties. D.I. 8 at Exh. 1. The order mandated the third party arm's-length purchase price be compared with the non-arm's-length contract prices to ensure proper valuation and thus proper payment of royalties to the United States. *Id.* MMS explained: "[i]n situations where crude oil or other mineral products are sold between affiliate companies in non-arms-length transactions, it is MMS's policy to look beyond the affiliate sales to arm's-length sales and to compare the involved values when determining royalties due." D.I. 29 at Exh. 23. Thus, Shell Oil was directed to provide access to documents evidencing its arm's-length sales of the oil produced under the federal leases. *Id.*

MMS based its order upon its interpretation of the Federal Oil and Gas Royalty Management Act ("FOGRMA"), section 103(a), 30 U.S.C. § 1713(a) (1986), and its accompanying regulations, 30 C.F.R. § 212.51(a) (1989). FOGRMA was enacted "to require the development of enforcement practices that ensure the prompt and proper collection and disbursement of oil and gas revenues owed to the United States and Indian lessors and those inuring to the benefit of the States...." 30 U.S.C. § 1701(b)(3). FOGRMA was not the child of idle curiosity by Congress; Congress was distressed by "gross repeated underpayments of royalties[,]" H.R.Rep. No. 97–859, 97th Cong., 2d Sess. 18 (1982); D.I. 34 at Exh. 1, a condition exacerbated by the extreme limits on MMS's authority that allowed the oil and gas industry to "operate essentially on an honor system." H.R.Rep. No. 97–859, at 15. A 1982 estimate by Congress indicated that the "honor system" resulted in $500 million in royalties uncollected per year. *Id.* at 16.

Shell appealed the Order to the Director of MMS. D.I. 29 at Exh. 24. The appeal was denied on March 1, 1991. D.I. 29 at Exh. 30. Shell then sought review of the Director's decision before the Interior Board of Land Appeals ("IBLA"), which on August 11, 1994, reversed the Director's Decision and held MMS could not seek production of the records in question. *Shell Oil Co.*, 130 IBLA 93 (1994). The IBLA based its reversal on the "marketing affiliate" provision of the FOGRMA regulations. Under the regulations, if an affiliate buys oil *only* from its affiliated producer, *see* 30 C.F.R. § 206.101, then it is considered a "marketing affiliate" and royalties to the lessee are based upon the affiliate's arm's length sale to third parties. 30 C.F.R. § 206.102(b)(1)(i). But because Shell Oil buys oil from sources other than Shell Ex, it is not a "marketing affiliate."[1] Following this reasoning, the IBLA initially held Shell Ex's production should be valued using the proceeds received from its contract with Shell Oil based on third party prices, because they "reflect a price that independent buyers in arm's-length transactions are willing to pay for production." *Shell Oil*, 130 IBLA at 97.

MMS petitioned for reconsideration, asserting the IBLA neglected the "gross proceeds rule" of regulation 206.102(h). The gross proceeds rule states that "under no circumstances shall the value of the production, for royalty purposes, be less than the gross proceeds accruing to the lessee." 30 C.F.R. § 206.102(h). On reconsideration, the IBLA reversed itself and affirmed the Director's decision. *Shell Oil Co. (On Reconsideration)*, 132 IBLA 354 (1995). The IBLA first noted that the term "lessee" in the gross proceeds rule "is specific and cannot be expanded to include an affiliate of the lessee." *Id.* at 356. Nevertheless, reasoned the IBLA, the purpose of the gross proceeds rule is to make clear "that no matter what valuation method is used, the value for royalty purposes cannot be less than the lessee's gross proceeds...." *Id.* at 356. The marketing affiliate provision, in other words, had "no relevance to the question whether the gross proceeds rule must first be applied ... no matter what regulatory benchmark is used to determine royalty, MMS must compare the result obtained thereby against a gross proceeds analysis in any case." *Id.*

---

**1.** The Government does not dispute that Shell Oil purchases from unaffiliated sources and is not a "marketing affiliate."

Finally, IBLA concluded that MMS has the authority to demand documents regarding Shell's sales to third parties because:

affiliates participating in a transfer of Federal lease production in contemplation of sales to a third party should expect MMS to scrutinize any interaffiliate transfer and all subsequent affiliate sales.... [Shell Ex] and Shell should have anticipated that MMS would review their handling of Federal production in order to properly determine royalty in accordance with statutory and regulatory requirements.... Accordingly, we find that Departmental regulations implementing 30 U.S.C. § 1711 (1988) [FOGRMA] anticipate that MMS will need to seek such information and provide the necessary authority that it may do so.

*Id.* at 357–58.

After its petition for reconsideration was denied, Shell filed its complaint in this action, alleging the IBLA's decision and its refusal to reconsider the decision are "arbitrary and capricious, violate the Department's regulations, exceed the Department's power under the Federal Oil and Gas Royalty Management Act (43 U.S.C. § 1701 *et seq.*), and are not in accordance with law in violation of the Administrative Procedure Act (5 U.S.C. § 706)." D.I. 1 at ¶ 9.

In sum, Shell seeks to deny MMS access to records of its disposition of crude oil to third parties. Shell argues the interaffiliate transaction between it and Shell Ex constituted the point of royalty computation. D.I. 1 at ¶ 8f. Shell maintains that MMS should do one of two things to value federal royalties: either (1) accept the terms of the agreement between Shell Ex and itself, or (2) use posted prices of arm's length sales by other produc-ers of substantially similar oil, or another similar formula provided in the royalty benchmarks of Department regulations, 30 C.F.R. § 206.102(c)(1)–(6). Additionally, Shell Oil argues the final decision of the IBLA must be reversed because the IBLA failed to identify and rely on any specific regulation implementing MMS's authority to request the documents at issue.

The Government counters that the plain language of FOGRMA and its regulations—and judicial precedent interpreting that language—requires Shell to produce the documents it seeks. Any other result, asserts the Government, would "game the royalty management system"; that is, so long as a lessee is crafty enough to set up an affiliate sale first, it can avoid paying its fair share of royalties to the United States Treasury.[2]

Both sides filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. A summary judgment motion will be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). As stated earlier, the parties are in agreement to virtually all of the essential facts. The crucible of their dispute is the legitimacy of IBLA's interpretation of FOGRMA and its concomitant regulations.

### III. DISCUSSION

The very narrow issue to be resolved is: Did the MMS act within its authority in requesting Shell Oil, a first purchaser of crude oil from its wholly owned affiliate, Shell Ex, to produce documents evidencing Shell Oil's resale to a third party when that resale is the first arm's length transaction of the oil? For reasons more fully explained

2. The Government, in its opposition brief, and the State of California, in its amicus brief, posit a helpful illustration of the way Shell's interpretation would lead to "royalty avoidance":

Company X has found a buyer willing to pay top dollar for oil. Company Y, a wholly owned affiliate of Company X, sells its crude oil production from federal leases to Company X for $20 per barrel. In turn, Company X sells the oil to its buyer, unrelated company, Company Z, for $21 a barrel; the lessee has sold similar oil to other buyers for $20.50 a barrel. The royalty benchmark value under 206.102(c) would then be $20.50. If Company Y is only required to value its production based on the gross proceeds of its transaction with its affiliate, Company X, then it has avoided paying royalty on $1 a barrel. If Company Y is required to value its production based on the benchmarks ($20.50), then it has still avoided paying royalty on $0.50 a barrel. The $0.50 a barrel goes unrealized by the Federal Government, unless MMS is allowed to accurately calculate Company Y's gross proceeds by examining the unaffiliated sale between Company X and Company Z.

below, the Court holds the answer to that question is yes.

### A. The Standard of Review

 Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, this Court has full powers of review over challenges to the legal determination of an administrative agency. When it comes to reviewing an agency's construction of its authorizing statute, the Supreme Court cautioned in *Chevron, U.S.A., Inc., v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984):

> If Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

An agency's interpretation of its own rules is given similar deference. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994); *Presinzano v. Hoffman–La Roche, Inc.*, 726 F.2d 105, 110–12 (3d Cir.1984); *see also Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (holding an "agency's interpretation of its own regulations need only be reasonable, and not the only interpretation or the one the court would have reached if it were initially faced with the question."). But if that interpretation of the regulations or the statute is contrary to legislative history or purpose, this Court will not hesitate to reject it. *See Santa Fe Int'l Corp. v. Watt*, 591 F.Supp. 929, 936 (D.Del.1984). Also, if an agency departs from its own longstanding construction of a statute, it must supply a reasoned analysis for its change of course. *Id.* (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). With these standards in mind, this Court turns to the Government's construction of FOGRMA, its regulations, and their applicability to Shell Oil.

### B. FOGRMA and its Regulations

#### 1. Section 103(a): Does "through the first sale" limit "persons" or "documents"?

 Section 103(a) of FOGRMA imposes record keeping requirements on certain parties involved in transactions of oil from federal lands. It states:

> A lessee, operator, or *other person directly involved in* developing, producing, transporting, *purchasing* or selling *oil* or gas subject to this chapter *through the point of first sale or the point of royalty computation, whichever is later, shall establish and maintain records,* make any reports, and *provide any information that the Secretary may, by rule, reasonably require for the purposes of implementing this chapter or determining compliance with rules or orders under this chapter.* Upon the request of any officer or employee duly designated by the Secretary or any state or Indian tribe conducting an audit or investigation pursuant to this chapter, the appropriate records, reports, or information which may be required by this section shall be made available for inspection and duplication by such officer or employee, State or Indian tribe.

30 U.S.C. § 1713(a) (emphasis added). There is no question Shell Oil is a "person" for purposes of section 103(a).[3] There is also no question that Shell Oil, as a purchaser from Shell Ex, was directly involved in the first sale of federal oil. Where the Government and Shell sharply differ is on the meaning of the phrase *"through the point of first sale or the point of royalty computation"* in the statute. The Government contends that it acts as a limit on the *persons* covered by FOGRMA; that is, only persons directly involved in the first sale or the point of royalty computation of federal oil are subject to the record keeping requirements.[4] To the Gov-

---

**3.** The term "person" is broadly defined in FOGRMA to encompass "any individual, firm, corpora-tion, association, partnership, consortium, or joint venture." 30 U.S.C. § 1702(12).

ernment, this case is a simple one; Shell was directly involved in the purchase of federal oil, so it must produce all documents MMS may, by rule, reasonably require.

Shell, on the other hand, asserts that the phrase also operates as a limit on *documents;* that is, Congress never intended parties to generate and maintain records at any point downstream from the point of first sale or royalty computation. Under this reading of the statute, Shell would be required under FOGRMA to retain documents pertaining to Shell's purchase of oil from Shell Ex, but not to its subsequent sale to a third party. Thus, Shell contends the MMS's 1990 order exceeds its statutory authority.

The issue is an interesting syntactical one: Did Congress intend the phrase *"through the point of first sale or point of royalty computation"* to modify *"lessee, operator or other person directly involved in ... purchasing"* or *"establish and maintain any records"*?[5] The most grammatical reading of the statute indicates the phrase "through the first sale" operates as a limit on the persons covered by FOGRMA. Elementary principles of English composition command a writer to "bring together the words and groups of words that are related in thought and keep apart those that are not so related.... Modifiers should come, if possible, next to the word they modify. If several expressions modify the same word, they should be so arranged that no wrong relation is suggested." WILLIAM STRUNK JR. & E.B. WHITE, THE ELEMENTS OF STYLE, 28–29 (3d ed. 1979). The phrase "through the point of first sale" is grouped with the phrase "person directly involved in ... purchasing". Further, "through the point of first sale" is separated from "establish and maintain any records" by a comma. Additionally, another expression quite clearly modifies "person"; the person must be "directly involved in developing, producing, transporting, purchasing, or selling" federal oil. The phrase at issue—"through the point of first sale"—immediately follows, unseparated by punctuation. To more clearly modify "records," Congress could have placed the phrase "through the point of first sale" directly after the word "information."[6] Or to make its point even more clearly, Congress could have expressly provided that no documents generated for any purpose after the first sale of the production, regardless of the form of that sale, need be maintained or produced.

But Congress is comprised of legislators, not grammarians or English professors. At times, the turbulent winds and waves of negotiation and compromise run the Ship of Syntax asunder. Shell has introduced evidence that, regardless of the most natural

4. Shell argues the Government's interpretation of section 103 has never been adopted by the IBLA and should be dismissed as "impermissibly *post hoc* [,]" D.I. 33 at 14, and the invention of appellate counsel, D.I. 42 at 3–4. This argument is devoid of merit. In *Shell Oil (On Reconsideration)*, 132 IBLA 354, the IBLA expressly relied on FOGRMA and concluded that "MMS has authority to demand production of documents" from Shell Oil. *Id.* at 356. Such an interpretation has also been adopted by the judiciary. In *Santa Fe Energy Products Co. v. McCutcheon,* 90 F.3d 409 (10th Cir.1996), the Tenth Circuit Court of Appeals held that a first purchaser of oil from an affiliate was a "person directly involved in ... purchasing oil or gas ... through the point of first sale or royalty computation." *Id.* at 414. Finally, a statute's meaning need not be expressly adopted by the Government for it to be evident.

5. In other words, is the prepositional phrase "through the point of first sale" used as an adjective modifying the gerund "purchasing" or as an adverb modifying the verbs "establish and maintain"? Again, the crucial sentence in section 103(a) reads:

> A lessee, operator, or *other person directly involved in developing, producing, transporting, purchasing, or selling oil or gas* subject to this chapter *through the point of first sale or the point of royalty computation,* whichever is later, *shall establish and maintain any records, make any reports, and provide any information* that the Secretary may, by rule reasonably require for the purposes of implementing this chapter or determining compliance with rules or orders under this chapter.

30 U.S.C. § 1713(a) (emphasis added).

6. Of course, Shell could counter that the Congress could have written the statute so that "through the point of first sale" more clearly referred to "person," but this misses the point. Between the Government's interpretation and Shell's interpretation, the Government's reading is more natural and grammatical. The vital question is whether the Government's interpretation is "based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

reading of the statute it drafted, Congress intended section 103(a) to limit FOGRMA's scope to particular records, as well as particular parties.[7] This evidence is steeped in the annals of legislative history.[8]

President Reagan's administration took the impetus of overhauling DOI's royalty management program. Its initial proposal— a progenitor of section 103—was far-reaching; the bill covered those who marketed and refined oil produced on federal leases, in addition to those who developed, produced, and transported it. H.R.Rep. No. 97–859, 97th Cong., 2d Sess. 52 (1982); S.Rep. No. 97–512, 97th Cong., 2d Sess. 39 (1982) U.S.Code Cong. & Admin.News 4268, 4293.

Evidently, Committees in both the Senate and the House of Representatives felt the Reagan Administration's proposal needed modification. The Senate Committee changed the bill to cover "any lessee, operator, or person engaged in the transport of an oil or gas resource prior to the first sale of such resource, or *any person involved in the first sale of an oil or gas resource ...."* S.Rep. No. 97–512, at 5, U.S.Code Cong. & Admin.News p. 4268 (emphasis added). The Senate's version "significantly narrow[ed]" the scope of the Reagan bill; the Senate explained its changes, reasoning "record-keeping after the first sale of the resources was not believed to be necessary by the Committee to accomplish the purposes of this bill and therefore was not authorized." *Id.* at 15–16, U.S.Code Cong. & Admin.News p. 4268–4270.

While the Senate limited its bill to persons transporting, selling, or purchasing oil, the House expanded coverage in its bill to those who developed, produced, marketed, refined and purchased oil as well. H.R.Rep. No. 97–

859, at 4. The House also extended coverage to the point of royalty computation; coverage of the Senate bill was limited through the first sale. *Id.* The House further included an explicit proviso that the obligation "to establish and maintain records, make reports, and provide information to the secretary shall not apply to any oil or gas after it has moved beyond the first sale or point of royalty computation, whichever is later." *Id.* In short, the House proposed to give MMS "broad authority to require any person handling oil (through the point of first sale or the point of royalty computation whichever is later)" to produce documents. *Id.* at 29.

Congress eventually enacted a "fair compromise between the Senate and the House version of the bill." 128 Cong.Rec. 30375 (1982). The result—what is now section 103 of FOGRMA—governed persons "developing, producing, transporting, purchasing, or selling oil ...," but excluded those in "marketing" and "refining." The section-by-section analysis explained that the compromise language *"[r]equires records of activities through the first sale or royalty computation point* for oil or gas." 128 Cong.Rec. 28829 (1982) (emphasis added). While the original Senate and House versions are either inconclusive or unpersuasive as to Shell's view of Congressional intent, these two aspects of the final product—the deletion of "marketing" from the final draft and the section-by-section analysis that accompanied it—provide Shell with its most powerful evidence that the point of sale limits not only the persons to whom FOGRMA rules apply, but also the documents to which they apply. After all, MMS seeks documents relating to marketing—namely, documents of Shell's subsequent sale of crude oil to third parties.[9] D.I.

7. Notwithstanding the limitation contained in the phrase "through the point of first sale," FOGRMA is also clearly limited to persons "directly involved" in transactions of oil or gas from federal leases.

8. The Supreme Court has elucidated the principle "when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Metropolitan Stevedore Co. v. Rambo,* — U.S. —, —, 115 S.Ct. 2144, 2147, 132 L.Ed.2d 226 (1995) (quoting *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct.

2589, 2594, 120 L.Ed.2d 379 (1992)). This Court recognizes that Shell can make a plausible textual argument that section 103(a) also limits the documents an entity must provide. As there is some ambiguity in the statutory language, this Court will consider legislative history.

9. Despite Shell's protestations to the contrary, MMS does not seek documents relating to Shell's refining. The only reference in the MMS order to crude oil transferred to a refinery is the request for documents "detailing the disposition (i.e., sold to a third party, exchanged or transferred to a [Shell] refinery) of Federal lease

29 at Exh. 23, at 2. But Congress removed marketing from the activities covered in the final version of section 103. And the section-by-section analysis refers only to a limit on *records of activities* through the first sale; it does not even remotely suggest that *persons* involved in a first sale must keep records of their subsequent disposition of oil.

These two chunks of evidence, however formidable they may be, ultimately prove insufficient to persuade this Court to adopt Shell's reading of Section 103. There are several reasons the phrase "through the point of first sale or royalty computation" should be read to define what entities—not what records—are subject to FOGRMA recordkeeping requirements. First, already discussed, is the text of the statute itself. Its most natural reading operates to limit the persons covered by FOGRMA; it expressly restricts the categories of persons who must produce documents. Second, not all of the legislative history favors Shell; it is clear Congress primarily intended to remove constraints on MMS's authority:

> [Section 103(a) as enacted] gives the Secretary *broad authority* to require *any person handling oil* (through the point of first sale or the point of royalty computation whichever is later) on Federal or Indian lands.... or the Outer Continental Shelf, to maintain any records, make any reports, and provide any information as the Secretary may by rule require for the purposes of implementing this Act.

crude oil production from the point where [Shell] takes title to the oil." D.I. 29 at Tab 23. MMS seeks the amount of oil Shell refined only so it can verify how much was resold; the Order did not seek any further documents regarding oil Shell has refined. No information regarding refinery data or costs, sale of refined products or anything else pertaining to Shell's refining activities is sought. *Id.*

10. FOGRMA's recordkeeping requirements apply to persons involved "through the point of first sale or the point of royalty computation, whichever is later, ..." 30 U.S.C. § 1713(a). Shell has devoted a significant portion of its briefs to an attempt to demonstrate the Department has construed the "point of royalty computation" as the equivalent of the "point of royalty settlement." The "point of royalty settlement" is the measurement point for the resources at issue; it is almost always on the lease. Since the phrase "point of first sale or the point of royalty compu-

H.R.Rep. No. 97–859 at 29. In this section it is clear that "through the point of first sale" refers to "any person handling oil," not the duty to maintain records. Thus, where section 103(a) is ambiguous, the Government's construction is eminently reasonable. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781; *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072–73, 39 L.Ed.2d 270 (1974).

 In summation, section 103(a) defines what parties are under MMS's authority.[10] Once these parties are under the FOGRMA rubric, they must establish and maintain any information that MMS may "by rule, reasonably require" to measure royalties. 30 U.S.C. § 1713(a). Congress has decided what parties will be subject to MMS's authority, and MMS is given great latitude to decide what documents it may reasonably need in royalty management. Any limits on documents,[11] therefore, must be found in the regulations. *See Santa Fe Prods. Co. v. McCutcheon,* 90 F.3d 409, 414 (10th Cir.1996) (holding first purchaser of oil produced under federal lease was a "person" for purposes of FOGRMA, and as such was required by regulations to "establish and maintain records" of its subsequent sale to third party).

**2. Regulation 212.51**

 Regulation 212.51 is the regulation that implements MMS's recordkeeping authority.[12] Subsection (a) provides:

tation, whichever is later" limits the category of persons who must provide documents, and Shell Oil was involved in the first sale, Shell is subject to FOGRMA's recordkeeping requirements. This Court need not address Shell's characterization of the "point of royalty computation."

11. Aside from a limit that the MMS's request be reasonable, of course. 30 U.S.C. § 1713(a).

12. Shell Oil points out the IBLA did not cite to 30 C.F.R. § 212.51 in *its* decision below; therefore, Shell argues, its decision must be dismissed because the APA requires the Department to identify a legislative rule, adopted under section 103 after notice and comment procedures, which provides the predicate to enforcement against Shell. But what the IBLA did was sufficient in this case. In the case below, *Shell Oil (On Reconsideration),* 132 IBLA 354, 356, the Board expressly followed its decision in a very similar

Records. Each lessee, operator, revenue payor, or *other person* shall make and retain accurate and complete records *necessary to demonstrate* that payments of rentals, royalties, net profit shares, and other payments related to offshore and onshore Federal and Indian oil and gas leases are in compliance with lease terms, regulations, and orders. Records covered by this section include those specified by lease terms, notices and orders, and by the various parts of this Chapter. Records also include computer programs, automated files, and supporting systems documentation used to produce automated reports or magnetic tape submitted to the Minerals Management Service (MMS) for use in its Auditing and Financial System (AFS) and Production Accounting and Auditing System (PAAS).

30 C.F.R. § 212.51(a) (1989) (emphasis added). As with section 103(a), both Shell and the Government hotly contest the scope of regulation 212.51(a). Namely, Shell presents two concerns: (1) whether Shell is a "person" contemplated in the regulation, and (2) whether it applies to the records of Shell's sale to a third party.

### (A) Is Shell a "person"?

■ Shell uses two pillars of reasoning to buttress its premise that it is not a person

for purposes of 212.51(a). First, Shell discounts the possibility MMS intended to define "person" under regulation 212.51(a) as broadly as Congress did in the statute.[13] If "person" is so broadly defined in 212.51(a), Shell reasons, "any citizen or business in the United States also meets that definition, whether or not connected to the oil and gas industry." *Id.* It follows, Shell argues, that each citizen or business in the United States is required to create and maintain records necessary to demonstrate that lessees have met their royalty obligations. *Id.* Since the vast majority of those people are unaware of that obligation, and of the prospect of MMS swooping down and imposing civil penalties on them for lack of compliance, Shell warns, MMS's construction of 212.51(a) may not give constitutionally required "fair warning" to those it purports to regulate.[14] *Id.*

Second, Shell asserts, any interpretation of "other person" in 212.51(a) to encompass purchasers like Shell would be inconsistent with 212.51(b). 212.51(b) defines how long a "person required to keep records under this section" must maintain those records. "Lessees, operators, revenue payors, or other persons" are required under the subsection to "maintain the records generated during the period for which they have *paying* or *operating responsibility . . . .*" *Id.* (emphasis added).[15] This signifies, in Shell's view, that

case, *Santa Fe Energy Products Co.*, 127 IBLA 265 (1993). In *Santa Fe*, there was, as here, a transfer between two affiliated companies, one of which was a federal lessee. 127 IBLA at 265–66. To value royalties, MMS sought to acquire the records of the first arm's length sale of the oil to a third party. *Id.* The IBLA found that "30 C.F.R. § 212.51 (1989) implemented section 103 . . . to provide authority for MMS to obtain information necessary to conduct an audit, and therefore, make a valuation determination." *Id.* at 268 (internal quotations omitted). Since the IBLA in *Shell Oil* relied on its reasoning in *Santa Fe*, the agency adequately invoked section 212.51.

Shell tries to minimize this by arguing that it has pressed different arguments than were presented in *Santa Fe;* therefore, even though the IBLA cited *Santa Fe*, it did not rely on a reasoned application of section 212.51. With respect to Shell, this argument proves too much. The narrow issue is whether the IBLA in *Shell Oil* relied on 30 C.F.R. § 212.51(a); it clearly did so by citing to a case interpreting the regulation. That it did not accept Shell's argument or elaborate on its reasoning is irrelevant. Therefore, this court is not, as Shell asserts, invading the province of the administrative agency by substituting what it considers to be more appropriate grounds for enforcement; the grounds were already there. *Compare SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (holding if the justification given is "inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate and proper basis.").

13. To reiterate, under FOGRMA a "person" is an "individual, firm, corporation, association, partnership, consortium, or joint venture." 30 U.S.C. § 1702(12), *incorporated in* 30 C.F.R. § 212.52.

14. This Court assumes Shell invokes the Due Process Clause of the Fifth Amendment, although Shell does not cite to it.

15. Regulation 212.51(b) reads in full:
Period for keeping records. Lessees, operators, revenue payors, or other persons required

the term "other person" as used throughout section 212.51, covers only persons with "paying or operating responsibility on the lease." [16] Since Shell Oil has neither responsibility, it claims it is not a "person" for purposes of 212.51.

These two pillars upon which Shell so ably constructs its case ultimately prove incapable, however, of withstanding the Government's frontal attack. First, section 103(a) of FOGRMA refers to persons "directly involved" in the purchase of oil. While 212.51 simply refers to each person—without a "directly involved" limitation—it is only reasonable to assume it means a person "directly involved" in the oil business, as it does in section 103(a). Indeed, the structural framework of FOGRMA and the regulations demonstrates this: section 103(a) sets out what persons are covered by the Act, and regulation 212.51 sets forth what records those persons must produce. MMS simply could not direct parties under 212.51 unless they were already under its purview by virtue of section 103(a). Finally, it must be remembered that MMS is not seeking the credit card slips of John Q. Citizen at the local gas pump. Rather, MMS is seeking documents from a large, sophisticated oil company, a company that was already required to produce documents of its transaction with Shell Ex as a first purchaser from its affiliated federal lessee. Shell's arguments that it is shocked to discover it is subject to regulation 212.51(a) ring hollow.

Similarly, it makes little sense to narrow the meaning of "person" in Section 212.51 to only a person with "paying or operating responsibility on the lease." The plain language of 212.51(a) indicates MMS intended "other persons" to include more than just operators and payors. The rule states that it applies to "lessee[s], operator[s], revenue payor[s], and other person[s]...." 30 C.F.R. § 212.51(a). If MMS truly intended to equate "other persons" with other "operators and payors," then 212.51(a) is transformed into utter nonsense. It would read: "Each lessee, operator, revenue payor, or other person [who is an operator or payor] shall make and retain accurate and complete records...." [17] If MMS intended such a limitation, it would have included it in the text of the regulation.

Upon further scrutiny, even the phrase in 212.51(b) emphasized by Shell does not support its interpretation of "other person." [18] To reiterate, 212.51(b) states that "[l]essees, operators, revenue payors, or other persons shall maintain the records generated during the period for which they have paying or operating responsibility on the lease for a period of six years." This sentence, however, was added by MMS during rulemaking in response to a request that MMS make it clear that "persons" could not dump their documents as soon as their obligations on the lease ended. *See* 49 Fed.Reg. 37,336, 37,338 (1984) (reflecting the MMS change that "[a]ll records must be retained for a period of 6 years even if paying or operating responsibilities have ceased."). Again, if MMS desired to limit the definition of "person" in regulation 212.51 it can be assumed it would have

---

to keep records under this section shall maintain and preserve them for 6 years from the day on which the relevant transaction recorded occurred unless the Secretary notifies the record holder of an audit or investigation involving the records and that they must be maintained for a longer period. When an audit or investigation is underway, records shall be maintained until the recordholder is released in writing from the obligation to maintain the records. *Lessees, operators, revenue payors, or other persons shall maintain the records generated during the period for which they have paying or operating responsibility on the lease for a period of 6 years.*
30 C.F.R. § 212.51(b) (emphasis added).

**16.** There is such an entity which is not a lessee or an operator or a royalty payor but still has

paying or operating responsibility—a company that is not the designated operator of the lease but which holds operating rights from the lessee. Operating rights are occasionally delegated in onshore oil and gas leases and are regulated by the Department Bureau of Land Management at 43 C.F.R. § 3106.4–1 (1988).

**17.** Likewise, the "other person" phrase in 212.51(b) would be rendered superfluous. Under Shell's view, 212.51(b) would state: "Lessees, operators, revenue payors, or other persons [who, of course, are operators or payors] required to keep records under this section shall maintain and preserve them ..."

**18.** *See supra* note 17.

done so in the text. Therefore, the agency's conclusion that Shell Oil is a "person" under regulation 212.51(a) is reasonable and entitled to deference. *See Thomas Jefferson Univ.,* 512 U.S. at ——, 114 S.Ct. at 2386.

### (B) Are Shell's Records Discoverable Under 212.51(a)?

■ Shell tries to highlight yet another infirmity in 212.51(a). Principally relying on *Dravo Corp. v. Occupational Safety and Health Review Commission,* 613 F.2d 1227 (3d Cir.1980), it argues that the regulation does not indicate with "ascertainable certainty" the records Shell must produce. D.I. 33 at 18–19. In *Dravo,* the Third Circuit Court of Appeals considered whether shipbuilding safety regulations were applicable to Dravo's structural shop. 613 F.2d at 1228. Dravo manufactured various heavy equipment, including barges, towboats, raw material processing machinery, dam equipment, locks and power plants. *Id.* at 1229. The regulations were limited to work "on the navigable waters ..., *including* dry docks, graving docks, and marine railways"; they did not include structural shops. *Id.* at 1232 (emphasis added). The court held:

> Because the Secretary has failed in his regulations to state that a structural shop is included with docks and marine railways as a place of maritime employment to which shipbuilding regulations apply, we believe that the structural shop at issue here is not to be held to shipbuilding safety standards.
>
> . . . . .
>
> Although the Secretary urges that the language of the definitions ... does not foreclose their applicability to areas other than waters, docks, and marine railways, we note that the definitions ... do *not* state with ascertainable certainty what *is* meant by the standards he has promulgated.

*Id.* at 1232–33 (quoting *Diamond Roofing Co., Inc. v. Occupational Safety and Health Review Comm'n,* 528 F.2d 645, 649 (5th Cir. 1976)).

Shell argues that *Dravo* controls this case. Regulation 212.51(a) expressly describes two kind of records included within its scope. The second sentence of the regulation states "[r]ecords covered by this section *include*

those specified by lease terms, notices and orders, and by the various parts of this Chapter." 30 C.F.R. § 212.51(a) (emphasis added). The third sentence states records also include computerized information that lessees and operators must submit. *Id.* Since there is no specific textual reference in section 212.51(a) to records maintained by a purchaser regarding its resale of oil, Shell argues, *Dravo* dictates that 212.51(a) does not state its applicability to Shell Oil with "ascertainable certainty." Thus, Shell asserts it had no fair warning it would be required to produce the records requested by MMS.

But Shell misreads the regulation; it ignores the first sentence of 212.51(a), which contains a specific requirement that persons "make and retain accurate and complete records *necessary to demonstrate* that payments of rentals [and] royalties ... are *in compliance with lease terms, regulations, and orders.*" 30 C.F.R. § 212.51(a) (emphasis added). The second and third sentences are mere examples of the records referred to in the first sentence; they do not define the records of the first sentence.[19] Since the first sentence contains a specific requirement, *Dravo* does not control this case.

*ITT Grinnell Corp. v. Donovan,* 744 F.2d 344 (3d Cir.1984), is analogous to this case. In *ITT Grinnell,* the Occupational Safety and Health Administration ("OSHA") cited ITT for failing to comply with standards of air quality in the workplace. *Id.* at 346. The citation required ITT, upon threat of civil penalty, to implement engineering and administrative controls to reduce air pollutants. *Id.* The Occupational Safety and Health Commission ("Commission") granted ITT's petition for a time extension, but conditioned it upon ITT's offering periodic health tests to certain employees. *Id.* ITT contested the condition, arguing that its due process rights were not satisfied because it was not apprised of the testing obligation in either a published regulation or a standard. *Id.* at 350.

The court dismissed the argument that *Dravo* dictated a judgment for ITT. *Dravo,* the court wrote, stood for the proposition that "an employer should not be subject to

---

19. For the text of 212.51(a), see pp. 801–802 *supra.*

penal sanctions for nonadherence to safety standards without adequate notice in the regulations of the exact contours of his responsibility." *Id.* (quoting *Dravo,* 613 F.2d at 1234). But there were no problems of fair notice in *ITT Grinnell.* The court reasoned:

> The decision of the Commission was prospective only, and that decision gave ample advance warning of its obligations. It informed ITT of what it would be required to do in the future to avoid potential liability for failure-to-abate penalties; it did not penalize ITT for past conduct. Thus, the Commission's decision did not impose a penalty on ITT without giving ITT fair notice of what conduct would subject it to penal sanctions and, therefore, did not deprive ITT of due process.

*Id.* at 350–51.

Similarly, the MMS order and the decision of the IBLA are "prospective only." They

do not penalize Shell Oil for a past violation of a safety standard; significantly, only Shell Ex would have to pay a penalty if one is assessed. Rather, as in *ITT Grinnell,* the order and decision simply tell Shell Oil what it must do in the future—produce documents relating to its arm's-length sale—to spare Shell Ex a citation. Nor does it require Shell to produce, under threat of penalty, records it may not have created and maintained in its possession.[20] Finally, an MMS policy paper expressly stated that since early 1988, affiliated purchasers were on notice their resale records might be requested for inspection by MMS.[21] *Dravo* simply does not apply to this case; Shell was not deprived of fair warning.[22]

Further, this is more akin to the long line of cases recognizing that an administrative agency's authority when it requests records

**20.** D.I. 29 at Exh. 23. Rather, the Order states "the State requires access to the following documents and records of [Shell] ..." *Id.* The Order then sets out a list of specific documents Shell would be expected to maintain in the ordinary course of its business. *Id.* If MMS does impose penalties for a failure to create and maintain records, as Shell fears it will, then Shell can contest the penalty at that time. Since no penalty has been imposed, and the Government has represented that it will not require Shell to produce documents it does not have, *see* D.I. 46 at 20, Shell cannot successfully argue it was deprived of fair warning in this proceeding.

**21.** *See infra* note 28 and accompanying text. This, of course, only answers the objections Shell has to MMS's request for the documents of resale covering an approximate nine-month period in 1988. *See infra* note 25 and accompanying text. Shell also objects it had no fair warning it would be required to produce documents relating to resales before 1988. This argument dissolves, however, in light of the Order; the Order does not, on its face, penalize Shell for failing to produce documents it may not have created or maintained. *See supra* note 20 and accompanying text.

**22.** The other cases cited by Shell are inapposite as well. Significantly, each case involved a need to give fair notice before a penalty for violation of a safety standard can be imposed. None involved a request to produce records pursuant to an administrative agency investigation. In *Phelps Dodge Corp. v. Federal Mine Safety and Health Review Commission,* 681 F.2d 1189 (9th Cir.1982), the court held that a civil penalty issued under a Mine Safety & Health Act ("MSHA") regulation was invalid because it did

not give the mining company "fair warning." The fine was issued for hazards caused by rocks and stones clogging a drop chute, which necessitated the use of manual labor to clear the chute. *Id.* at 1191. The MSHA regulation, however, was enacted "to protect workers from the hazards of electrical shock, not such hazards as may attend removal of rocks from the chute." *Id.* at 1192. In fact, the MSHA regulation was "sandwiched between regulations whose purpose is manifestly to prevent the accidental electrocution of mine workers." *Id.* Regulation 212.51 of FOGRMA, on the other hand, clearly relates to royalty valuation; it was not hidden so that Shell would be misled.

In *Kropp Forge Co. v. Secretary of Labor,* 657 F.2d 119 (7th Cir.1981), a steel forging plant was fined $5000 because noise levels generated by its hammers exceeded 90 decibels and the plant's hearing conservation program lacked six elements. *Id.* at 121. The court found the plant had no "fair warning" since the regulation provided only that "a continuing effective hearing conservation program shall be administered," and the six elements were not included in the regulation or any manuals, were not known by the compliance officers, and some of the elements were even expressly discounted in a guide issued by the Labor Department. *Id.* at 122–23. Here, MMS is not holding Shell to a specific, unwritten element of the regulation; it is relying on the general scope of the regulation. Furthermore, the possibility that an affiliated purchaser might have to produce documents from a first arm's-length sale was never expressly discounted by MMS. In fact, in an identical scenario in 1988—two years before the order in this case—it ordered Santa Fe Energy Products Company to

and undertakes investigatory functions related to its responsibilities is very broad. *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950) (holding "it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is relevant."); *Oklahoma Press Publishing v. Walling*, 327 U.S. 186, 216, 66 S.Ct. 494, 509, 90 L.Ed. 614 (1946) (commanding the investigative function cannot be limited "by forecasts of the probable result of the investigation.") (quoting *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919)); *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 508–09, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943) (holding it is the duty of the District Court to order production of evidence unless it is "plainly incompetent or irrelevant to any lawful purpose of the Secretary in the discharge of his duties under the Act."). Indeed, the Third Circuit Court of Appeals has upheld document production demands from related entities in a case where the "material requested was relevant to the inquiry and sufficiently definite. . . ." *EEOC v. University of Pittsburgh*, 643 F.2d 983, 985–86 (3d Cir.), *cert. denied*, 454 U.S. 880, 102 S.Ct. 362, 70 L.Ed.2d 190 (1981). *See also United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 574–75 (3d Cir.1980); *EEOC v. American Express Centurion Bank*, 758 F.Supp. 217, 220–21 (D.Del.1991).

Shell attempts to distinguish this precedent by noting the statutory language in each case; unlike the statutes in the other cases, Shell contends, section 103 was enacted with the clear purpose to limit MMS's authority to order the production of records. As an initial matter, this Court does not endorse Shell's reading of the legislative history. *See* H.R.Rep. No. 97–859 at 29 (quoted supra p. 16). Further, the statute in each case directed persons subject to its purview to produce all information necessary to complete the investigation of the administrative agency. Section 103 does nothing more, and nothing less.

◼ Finally, Shell relies on the Government's documents under the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq.* to show MMS never contemplated examining records of Shell's resale to a third party.[23] The PRA prevents a federal agency from collecting information until it has submitted the proposed information request to the Office of Management and Budget ("OMB"), has received OMB's approval, and displayed OMB's control number on the "collection of information." 44 U.S.C. § 3507(a). The Government has used six forms approved by OMB, and the Government concedes none of them is addressed to affiliated first purchasers to keep documents needed to demonstrate the lessee's compliance with royalty standards. In Shell's view, this demonstrates the Government has dropped all pretense of consonance with the original un-

---

produce documents relating to a first sale to an independent party. *Santa Fe Energy*, 127 IBLA 265 (1993).

In *Diebold, Inc. v. Marshall*, 585 F.2d 1327 (6th Cir.1978), a manufacturer of security files was cited for violating an OSHA regulation that required a special guard on some of its equipment. In holding the manufacturer was not given "fair warning," the court compiled a litany of factors, such as unartful drafting of the guard standard, the industry practice of not installing such a guard, and the fact that a clear majority of Administrative Law Judges had held the regulation inapplicable to the guard. *Id.* at 1336. While none of the factors was compelling on its own, the court reasoned, their cumulative effect deprived the manufacturer of its constitutional rights. *Id.* at 1337. This is simply not the case here.

In *Diamond Roofing Co., Inc., v. Occupational Safety and Health Review Commission*, 528 F.2d 645 (5th Cir.1976), a roofing company was cited

for allowing employees to work on roofs with unguarded sides or edges. The court rejected the Secretary of Labor's argument that a roof should be considered an "open-sided floor," which was required by regulation to have railings surround its perimeter. *Id.* at 648. Furthermore, the court noted in *Diamond Roofing*, ten of twelve cases before an Administrative Law Judge had held that the regulation did not apply to roofs. *Id.* at 650. Significantly, the only case squarely on point—*Santa Fe Energy Products*—was expressly followed by the IBLA in this case.

23. Shell raised the PRA argument for the first time in its reply brief. D.I. 42 at 11–14. The Government urges this court not to entertain the PRA issue since it should have been first presented to the IBLA. Since it ultimately does not change the outcome of the case, however, this Court will briefly address it.

derstanding and intent surrounding the valuation rules.

Shell has misread the PRA, however. The PRA specifically exempts activities such as an MMS audit from its requirements. The PRA "shall not apply to the collection of information ... during the conduct of ... an administrative action or investigation involving an agency against specific individuals or entities." 44 U.S.C. § 3518(c)(1)(B)(ii). Indeed, the Tenth Circuit Court of Appeals has rejected the argument that MMS cannot require the production of information in the course of an audit without a control number for its request. *Phillips Petroleum Co. v. Lujan,* 963 F.2d 1380, 1388 (10th Cir.1992). Shell's argument is essentially this: MMS is limited in its investigations to the subjects covered in the forms MMS uses for routine inquiries because those forms are the only documents with OMB control numbers. This position is untenable; Shell is trying to limit MMS in a way that would seriously curtail its investigative efforts and in a way Congress never intended in passing either FOGRMA or the PRA. *See EEOC v. American Express Centurion Bank,* 758 F.Supp. at 221.

MMS had authority to order the production of documents under 212.51(a). Its interpretation of its regulations was reasonable, and Shell's cry that it is "left to guess" at what records it might have to produce is implausible in light of the explicit MMS order and the text of 212.51(a).[24]

**24.** *Shell posits a line of IBLA decisions in an attempt to demonstrate MMS never examined documents of an affiliate's resale when calculating royalty payments. See Transco Exploration & TXP Operating Co.,* 110 IBLA 282 (1989); *Amax Lead Co. of Mo.,* 84 IBLA 102 (1984); *Getty Oil,* 51 IBLA 48 (1980). It follows, Shell argues, that MMS did not contemplate the records sought here when it drafted regulation 212.51(a). Shell's cases are factually dissimilar, however. Until its decision in *Santa Fe,* 127 IBLA 265 (1993), the IBLA was never squarely presented with a situation in which an affiliated purchaser of oil from a federal lessee in a non-arm's length transaction resold production to third parties. See *supra* note 11 for a discussion of the IBLA's decision in *Santa Fe.* And in each of the decisions cited by Shell, the IBLA recognized MMS's authority to look to documentation beyond that of the transaction between two affiliated companies to fairly assess royalties. *See Transco,* 110 IBLA at 322 ("where there is a contract between affiliates or subsidiaries, there must be independent indicia establishing that the contract price is one fairly derived from the marketplace."); *Amax Lead,* 84 IBLA at 102 (independent evidence that price is accurate portrayal of the article's worth may be required in affiliated transaction); *Getty Oil,* 51 IBLA at 51 ("If a transaction is not at arm's length, some other manifestation that the price is nonetheless an accurate portrayal of the article's worth is required.").

### 3. The Royalty Valuation Standards— 30 C.F.R. § 206.102

This opinion should cease without meeting the merits of the valuation regulations. Shell Oil is a person covered by section 103 of FOGRMA, it is a person for purposes of regulation 212.51(a), and MMS could reasonably require its records to determine if Shell Ex was complying with the lease terms, regulations or orders.

■ Nonetheless, Shell argues, quite forcefully, that this Court must examine the valuation standards set forth in 30 C.F.R. § 206.102.[25] It urges MMS "abandoned several well-settled principles of royalty valuation" when it sought Shell's records. D.I. 33 at 20, and for this additional reason, exhorts this Court to invalidate MMS's request for Shell's records of its resale of oil to a third party.

As amended in 1988, 30 C.F.R. § 206.102 sets forth valuation standards for oil produced from federal leases. Oil sold pursuant to a non-arm's length contract is determined by the first applicable of five benchmarks in 30 C.F.R. § 206.102(c). Four benchmarks use prices in arm's-length sales of like-quality oil; the fifth benchmark allows MMS to use "any other reasonable method of value." 30 C.F.R. § 206.102(c)(1)–(5). Shell argues that since Shell Oil paid Shell Ex using third-party posted prices, MMS should follow the benchmarks and use the contract price to fix the royalty value.

**25.** The valuation regulations were amended in 1988. *See* 30 C.F.R. § 206.103 (1984), *amended* 30 C.F.R. § 206.102(c). The new regulations cover resales by Shell over a duration of only about nine months. Since both sets of regulations contained an equivalent gross proceeds rule, the changes made in 1988 are irrelevant for this opinion.

Section 206.102(h), however, states that "[n]otwithstanding any other provision of this section, under no circumstances shall the value of production, for royalty purposes, be less than the gross proceeds accruing to the *lessee* ..." 30 C.F.R. § 206.102(h) (emphasis added). MMS described the purpose of this subsection—known as the "gross proceeds rule"—as:

> to make it clear that no matter what valuation method is used, the value for royalty purposes cannot be less than the lessee's gross proceeds less applicable allowances. *Therefore, if a benchmark derived value less applicable allowances is less than gross proceeds less applicable allowances, gross proceeds less applicable allowances is to be used as the value for royalty purposes.*

52 Fed.Reg. 30826, 30843–44 (1987) (emphasis added). Therefore, under 30 C.F.R. § 206.102(h), the value of production derived from the benchmarks must always be compared to gross proceeds. To determine gross proceeds, the Government reasons, it is necessary to look at the affiliate's gross proceeds from the first arm's-length sale, not just the proceeds from the sale between the two affiliated parties.

But Shell counters by stressing the reference in the gross proceeds rule to proceeds "accruing to the lessee"; the term "lessee" is not expressly defined to include affiliated entities for purposes of the gross proceeds rule. In contrast, the valuation benchmark subsection, section 102(c), does define "lessee" to include more than just the oil producer. Under the first benchmark, the value of oil is based on the *"lessee's* contemporaneous posted prices...." 30 C.F.R. § 206.102(c)(1) (emphasis added). When this particular subsection was proposed, a potential problem was spotted: "most, if not all, posted prices are prices posted by a purchasing, marketing, or transporting entity, some of which may have producing lessee affiliates.... [T]aken literally, there will not be a *lessee's* posted price." 53 Fed.Reg. 1184, 1202 (1988). Therefore, MMS adopted section 206.102(c)(6), which states: "For purposes of this paragraph, the term lessee includes the lessee's designated purchasing agent ..." Unlike section 206.102(c), however, the gross proceeds rule in subsection 206.102(h) does not expand the definition of "lessee"; thus, argues Shell, only Shell Ex—as the lessee—must pay on the gross proceeds it received.

The Government responds to Shell's persuasive textual arguments with strong prudential considerations of its own. According to the Government, Shell's interpretation eviscerates the gross proceeds rule and elevates form over substance. Any federal lessee with a purchaser willing to pay top dollar could simply avoid the gross proceeds rule in three simple steps: (1) transfer production to an affiliate at a price lower than what it knows it could obtain by selling to the purchaser; (2) have the affiliate immediately resell to the ultimate purchaser; and (3) refuse to produce documents regarding the arm's length sale.[26] The regulations should not be construed to extol self-dealing, warns the Government; otherwise, a crafty lessee could effectively blind MMS to the first arm's length sale—and the true amount of gross proceeds—by setting up an affiliate sale first.

Indeed, the Tenth Circuit Court of Appeals, in a case almost indistinguishable from this one, arrived at the same conclusion about the gross proceeds rule. *Santa Fe Energy Prods. Co. v. McCutcheon,* 90 F.3d 409 (10th Cir.1996). In *Santa Fe,* a federal oil lessee, Santa Fe Energy Company ("Energy"), sold oil to an affiliate, Santa Fe Energy Products Company ("Products"), under a non-arm's length agreement. *Id.* at 411. Products then marketed the oil to third party purchasers; to verify the lessee's royalty payments, the Government sought documents regarding the third party sale. *Id.* Although it did not address in great detail many of the arguments Shell now presses before this Court, the Court of Appeals upheld the MMS order to the affiliate to produce documents regarding its sale to the unaffiliated purchasers. *Id.* at 414. First, it concluded that because Products was a first purchaser of oil produced under a federal lease, it was a person "directly involved" in purchasing oil under Section 103(a) of FOGRMA. *Id.* As such, it was subject to

---

**26.** See *supra* note 2 for the financial ramifications of such a procedure.

the statute's recordkeeping requirements. *Id.* But more significantly, the court rejected Products' argument that the first interaffiliate sale should be the point of royalty computation. *Id.* Instead, it held that Products' resale records were "necessary" within the meaning of regulation 212.51(a); MMS could "reasonably require information relating to Products' sales in order to ascertain the oil's fair market value and to determine the gross proceeds accruing to Energy." [27] *Id.*

 This Court agrees with *Santa Fe* insofar as it holds MMS may reasonably require a first purchaser to produce documents regarding its first arm's length sale to a third party. This Court resists the temptation, however, to weigh in on the substantive merits—however ably presented by counsel—of the gross proceeds rule. It is enough, at this point, to hold that MMS could reasonably believe documents from Shell Oil's resale to a third party were necessary to demonstrate Shell Ex's compliance with the royalty regulations. Whether the valuation standards can be properly applied to treat Shell Oil's proceeds from its sale to a third party as Shell Ex's gross proceeds is an issue not before the Court. Significantly, there has been no calculation of proceeds, no use of the valuation standards in 206.102, no

finding of royalty underpayment, no order to pay. There has only been an order requiring a first purchaser to produce certain documents regarding its resale to a party in a first arm's length agreement. If, after getting the information, MMS uses the valuation standards, if MMS decides the gross proceeds rule applies, if it decides there has been an underpayment of royalties, if it decides to issue an order to pay, and if Shell Ex decides to appeal that order—then and only then can a court entertain a challenge to the gross proceeds rule as applied.

Shell argues this Court must decide the merits of the gross proceeds rule as applied to Shell Oil because this Court is restricted to reviewing what the IBLA actually held below. According to Shell, the IBLA in *Shell Oil (On Reconsideration)* concluded the gross proceeds rule allows MMS to impute Shell Oil's proceeds on resale to Shell Ex. While Shell may ultimately be correct that the IBLA will do if asked to impute Shell Oil's proceeds to Shell Ex, that is not what the IBLA did below. In *Shell Oil (On Reconsideration)*, the IBLA was directed to a policy paper issued by MMS. 132 IBLA at 357. The policy paper indicated MMS would look at an affiliate's resale to a third party to determine gross proceeds to the lessee. [28] *Id.*

27. The court applied the regulations as they existed prior to the 1988 amendments. *Santa Fe Energy*, 90 F.3d at 413. Under the pre–1988 regulations, there was no "marketing affiliate" provision, now in 206.102(b)(1)(i), and no separate royalty benchmark provisions, now found in 206.102((c)(1)–(5). Furthermore, the gross proceeds rule was not set off in a separate subsection, as it is now in 206.102(h). Nevertheless, those differences are immaterial for purposes of interpreting the gross proceeds rule. The regulation scrutinized in *Santa Fe* reads as follows:

The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product as determined by the Associate Director due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices, and to other relevant matters. Under no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value

as shall have been determined by the Secretary.
30 C.F.R. § 206.103 (1984), *amended* 30 C.F.R. § 206.102 (1988).

28. In pertinent part, the paper states:

**A.** **Sales of Oil and Natural Gas on or after March 1, 1988**

\* \* \* \* \* \* \*

**2.** **From a Lessee to an Affiliate (other than a Marketing Affiliate)**

\* \* \* \* \* \*

The value for both oil and gas is to be determined by the first applicable benchmark [in 30 C.F.R. § 206.102(c)]....

When applying the benchmarks, it is necessary to consider the gross proceeds requirement discussed previously.... If the resale from the affiliate to a third party occurs in the same field as the first sale from the lessee to the affiliate and if the affiliate is performing services other than transportation or processing (i.e., marketing services), the resale price would represent the minimum value for royalty purposes under the gross proceeds requirement....

Quoting the policy paper, the IBLA reasoned:

> Contrary to the argument advanced by Shell, therefore, the policy paper also indicates that there is an obligation and an expectation that MMS will look beyond any inter-affiliate transfer to determine whether other factors affect production value. As suggested in *Santa Fe, supra,* affiliates participating in a transfer of Federal lease production in contemplation of sales to a third party should expect MMS to scrutinize any inter-affiliate transfer and all subsequent affiliate sales. As a result, SWEPI [Shell Ex] and Shell should have anticipated that MMS would review their handling of Federal production in order to properly determine royalty in accordance with statutory and regulatory requirements; they must therefore provide the relevant information sought by MMS. Accordingly, we find that Departmental regulations implementing 30 U.S.C. § 1711 (1988) anticipate that MMS will need to seek such information and provide the necessary authority that it may do so.

*Id.,* at 357–58.

According to the policy paper, Shell was on notice since early 1988 that its resale records might be requested. The policy paper effectively rebuts Shell's argument that it was deprived of "fair warning" it would have to produce documents pertaining to its resale of federal oil. The IBLA repeatedly stressed that Shell should "expect" and "anticipate" a request to examine its records. The IBLA did not reach the merits of the gross proceeds rule as applied in this case; on the contrary, its statement that the term lessee "is specific and cannot be expanded to include an affiliate of the lessee," *id.* at 356, strongly reinforces the conclusion that it will consider MMS's valuation principles in this case—if they are ever applied and an order to pay is ever assessed—at another time. Therefore, the Court declines Shell's invitation to decide the merits of the gross proceeds rule as applied to Shell Oil or Shell Ex.

Shell provides another argument as to why this Court must determine the depth and meaning of the valuation standards, including the gross proceeds rule, in this action. By upholding the MMS order to produce documents as "necessary to demonstrate" compliance with the royalty regulations, Shell argues, the Court is implicitly accepting the Government's underlying assumption that the gross proceeds to Shell Oil shall be imputed to Shell Ex, even though they are two distinct legal entities.

 Shell is confusing a production of documents request with a substantive merits determination. Shell cannot refuse to turn over documents simply because it feels they will show MMS is unauthorized to assess additional royalty payments. *See Phillips Petroleum Co. v. Lujan,* 963 F.2d 1380, 1386 (10th Cir.1992); *Phillips Petroleum Co. v. Lujan,* 951 F.2d 257, 259–60 (10th Cir.1991). As the Supreme Court wrote in considering the execution of an administrative subpoena in *Oklahoma Press Publishing v. Walling,* the investigative function of an agency cannot be limited by "forecasts of the probable result of the investigation." 327 U.S. at 216, 66 S.Ct. at 509. The reasons for this judicial reticence to intercede are manifest; as this district has explained, "The agencies, not the courts, are responsible for determining in the first instance through preliminary investigation the coverage of the statutes they must administer. Therefore, the courts should intervene only in the most unusual and compelling circumstances." *American Express Centurion Bank,* 758 F.Supp. at 221 (citing *EEOC v. South Carolina Nat'l Bank,* 562 F.2d 329, 332 (4th Cir.1977)). Without an assessment of royalties through the use of the valuation standards, without a finding of underpayment, without an order to pay, in short, without a factual record, this Court is not presented with such "unusual and compelling circumstances."

Once again, this Court emphasizes the very narrow decision it reaches today; what this Court does not hold is perhaps just as

Memorandum from the Associate Director for Royalty Management, to the Deputy Associate Directors for Operations, Compliance, and Audit 3–4 (Oct. 14, 1993) (document from United States Department of Interior, Minerals Management Service) (quoted in *Shell Oil (On Reconsideration),* 132 IBLA at 357).

significant as the core holding itself. This Court does not hold the interpretation of the gross proceeds rule posited by the Government in this proceeding is correct; indeed, the factual vacuum in which this Court must proceed cannot sustain the vitality of such a holding. Rather, this Court holds only that under 30 U.S.C. § 1713(a) and 30 C.F.R. § 212.51(a), Shell Oil must produce the documents requested in MMS's 1990 order.